2016 IL App (1st) 152205

FOURTH DIVISION
June 23, 2016

No. 1-15-2205

| | | |
|---|---|---|
| DANIELLE DOBIAS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 13 L 11744 |
| OAK PARK AND RIVER FOREST HIGH SCHOOL | ) | |
| DISTRICT 200, THOMAS TARRANT, and | ) | |
| JOHN STELZER, | ) | Honorable |
| | ) | John P. Callahan |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Howse concurred in the judgment and opinion.

**O P I N I O N**

¶ 1    In this appeal, we are asked to determine whether any or all of the following statements made in writing by a high school coach about the plaintiff—one of his assistant coaches and also a teacher at the school—constitute defamation *per se*:

i. That the plaintiff "[w]as rolling around on a bed in a hotel room alone with an athlete";

ii. That the plaintiff visited athletes late one night while they were drinking alcohol and using drugs and "hung out" with them, later taking them home without informing the school or their parents about their behavior;

iii. That the plaintiff "[c]elebrated an athlete's accomplishment by drinking alcohol";

iv. That the plaintiff was "verbally and physically aggressive toward" him; and

v. That the plaintiff "[p]hysically assaulted [him] by grabbing [his] arm and trying to force [him] into a room at the end of the school day."

¶ 2    We hold that the first two statements constituted defamation *per se*, and we thus reverse the dismissal of the defamation claims to this extent. We hold that all other statements did not constitute defamation *per se*, and the claims relating to those statements were properly dismissed.

¶ 3    Plaintiff, Danielle Dobias, a schoolteacher and assistant coach at Oak Park and River Forest High School, sued her employer and her two supervisors, defendants Thomas Tarrant and John Stelzer, alleging defamation *per se* and false-light invasion of privacy based on a number of statements made by Tarrant about plaintiff concerning her interactions with athletes and with Tarrant himself. The circuit court dismissed the third amended complaint, ruling that the statements at issue were capable of innocent constructions, were nonactionable opinion, or were not highly offensive to a reasonable person.

¶ 4                                I. BACKGROUND

¶ 5    Plaintiff filed her original complaint on October 23, 2013, followed by several amended complaints. She filed her third amended complaint on November 7, 2014. Count I alleged defamation *per se*; count II alleged false-light invasion of privacy; count III alleged willful and wanton misconduct against Tarrant; and count IV alleged willful and wanton improper supervision against the high school. Only counts I and II are before us; plaintiff has waived her claims in counts III and IV.

¶ 6    As the complaint was dismissed pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)), we must accept all well-pleaded facts in the complaint as true. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 384 (2008). Our review is limited to whether the third amended complaint stated a cause of action for defamation *per se* or false-light invasion of privacy. Because the context in which an allegedly defamatory

statement is made must be considered as part of a court's analysis (see, *e.g.*, *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 415 (1996)), we include most of plaintiff's allegations. We also include the entire statements contained in the exhibits on which plaintiff bases her complaint.

¶ 7   According to the allegations in the third amended complaint, both plaintiff and Tarrant are schoolteachers for defendant Oak Park and River Forest High School District 200 (OPRF). Plaintiff is a special education teacher; Tarrant was a special education behavioral interventionist with OPRF's behavioral intervention program whose duties included assisting students and staff, including plaintiff, in maintaining discipline with disruptive and/or disorderly students. Tarrant's office was a short distance from plaintiff's classroom on the fourth-floor.

¶ 8   Plaintiff is the assistant coach of the boys' track and field team and was also a former assistant coach for the girls' cross-country team. Tarrant, as head coach for the girls' cross-country team, was plaintiff's supervisor. Defendant, John Stelzer, OPRF's athletic director, was also plaintiff's supervisor.

¶ 9   The complaint alleges that in March 2012, when plaintiff and Tarrant were both married to other individuals, Tarrant told plaintiff that he was in love with her. Plaintiff rejected his advances. In April 2012, Tarrant asked plaintiff about her marriage and told her he would be "the perfect match" for her. Tarrant also gave plaintiff a blanket, telling her it was "good for fertility." Plaintiff again rejected his advances. She reported the incidents to OPRF officials but received no response.

¶ 10   In July 2012, Tarrant began a pattern of retaliation against plaintiff. This alleged retaliation involved Tarrant's role as a behavioral interventionist, as well as his role as plaintiff's supervisor for the girls' cross-country team.

¶ 11            A. Tarrant's Alleged Retaliation as Behavioral Interventionist

¶ 12    Tarrant began ignoring plaintiff's requests for special education behavioral intervention. These included her request that Tarrant meet with recently suspended students, who were being returned to her classroom, to counsel them about avoiding fights in her classroom. Tarrant also ignored plaintiff's request for help after one of her students sent her a "crude paper" and made a "sexual gesture" to her.

¶ 13    In September, plaintiff's seventh-grade students stopped doing their work and said to plaintiff: "You won't be here for much longer." Plaintiff sent the students to Tarrant's office for discipline. They returned laughing and said, "Everyone says you are getting fired." A few days later, Tarrant refused another request for help from plaintiff with students in her classroom. Tarrant also ignored plaintiff's e-mail request for help after a student walked out of her classroom after she reprimanded the student for discussing drugs.

¶ 14    Tarrant continued to ignore plaintiff's requests for behavioral intervention from October through December 2012. Plaintiff continued to complain to superiors and continued to request that Tarrant perform his duty. There was no investigation, corrective action, or response. In November 2012, plaintiff requested peer mediation through human resources regarding Tarrant's continued refusals to assist her in her job. Tarrant refused to participate.

¶ 15                    B. Tarrant's Alleged Retaliation as Head Coach

¶ 16    Plaintiff also alleged that Tarrant retaliated against her in his role as her supervisor for the girls' cross-country team. Starting in July 2012, Tarrant, who had previously rated plaintiff as "excellent" in all of her coaching performance evaluations, began rating her as only "good" to "satisfactory." Tarrant asked plaintiff if he needed to get another assistant coach for the girls' cross-country team. He also began refusing her requests for coaching schedule changes that he had previously allowed. He ignored plaintiff during girls' cross-country team matches and

refused to meet with her for coach meetings, stating he would talk only with the other female assistant coach. He refused to provide plaintiff with a copy of his girls' cross-country team schedule. Plaintiff therefore had to, for the first time, create her own schedule.

¶ 17 In September 2012, plaintiff told Tarrant to stop asking other school personnel questions about her. Tarrant asked others where plaintiff was moving her residence. When plaintiff and the other female assistant coach took a weekend trip, Tarrant asked the other coach where plaintiff would be sleeping. He also told plaintiff she should not coach the cross-country team with him.

¶ 18 C. Alleged Retaliation Against Plaintiff by OPRF, Tarrant, and Stelzer

¶ 19 In October 2012, plaintiff complained to OPRF supervisors that Tarrant had made inappropriate romantic and sexually harassing overtures to her. Ten days later, in retaliation for her complaint about Tarrant, OPRF's human resource director ordered plaintiff not to attend the State cross-country match that plaintiff was supposed to coach.

¶ 20 1. Stelzer Fires Plaintiff as Assistant Head Coach

¶ 21 On January 15, 2013, two days after returning from Christmas break, Stelzer, the athletic director, told plaintiff she would be fired as assistant cross-country coach for the following year. This decision was based on a poor evaluation by Tarrant and caused plaintiff to lose her coach's stipend of approximately $6000 per year. Stelzer told plaintiff that she could reapply for the position if her relationship with Tarrant improved. Tarrant refused to go over the latest performance evaluation with plaintiff.

¶ 22 2. OPRF Reassigns Tarrant

¶ 23 In January 2013, plaintiff complained to school officials about having no behavioral interventionist support from Tarrant. A day later, she also complained that Tarrant stalked her while she coached the boys' track and field team.

¶ 24    In February 2013, Tarrant was removed as plaintiff's behavioral interventionist. Tarrant's office remained on the fourth floor near plaintiff's classroom, and plaintiff was told to call someone on the first floor if she needed assistance.

¶ 25                    3. Plaintiff and Tarrant Sign No-Contact Agreements

¶ 26    In March 2013, plaintiff was told that, due to an investigation regarding her complaints against Tarrant, she was to stay away from the school until told to return. Five days later, both plaintiff and Tarrant signed documents that they would not talk to, or about, the other or park next to the other (signed written no-contact agreement).

¶ 27            4. Tarrant Refuses Plaintiff's Request for Assistance in Her Classroom

¶ 28    On March 15, 2013, one of plaintiff's special education students became out of control, threw a computer and shouted that he was going to "kill" plaintiff and the students in her classroom. Plaintiff called Tarrant's assistant for help because she believed she was in immediate danger. The assistant told Tarrant there was an "out-of-control" student, but Tarrant refused to go to plaintiff's aid. A teacher in a nearby classroom heard the commotion, went to plaintiff's classroom and escorted out all of the students, except for the threatening student who then charged at plaintiff. Plaintiff talked the threatening student down, but she later complained to officials that Tarrant had refused to assist her.

¶ 29                        5. OPRF Reassigns Plaintiff

¶ 30    Four days later, plaintiff was told that her classroom would be moved the following year and she would not be teaching four special education classes. Plaintiff was instead assigned to four study halls, even though no other teacher had more than two study halls. When plaintiff complained to school officials, they told her she was part of a "messed up situation" with a

"messed up guy" and that everyone wanted "it to go away." When plaintiff asked why she was being punished with a different schedule, she was told "it's just how it worked out."

¶ 31    When plaintiff returned to school the following August, she had no desk, telephone, or computer. On August 26, 2013, plaintiff's e-mail to another teacher suddenly appeared on students' computer screens. A school information technology (IT) employee told her that he was looking at her e-mails.

¶ 32                              D. Alleged Defamatory Statements

¶ 33    We first clarify which statements are relevant to our analysis. In her third amended complaint, plaintiff stated that the statements at issue were: (1) the written statements contained in Exhibit A (the September 2013 e-mails); (2) the written statements contained in Exhibit B (Tarrant's grievance); (3) the oral statement, "You won't be here for much longer"; and (4) the oral statement, "Everyone says you are getting fired." Plaintiff alleged that these last two statements were made by her seventh-grade students. Plaintiff does not attribute these statements to defendants. And even if an inference could be made that Tarrant made the statement that plaintiff was getting fired (because it was made by the students after they returned from his office), plaintiff has not argued that an inference can be made that Tarrant made these statements. In fact, plaintiff does not address these statements at all and, in her opening brief, argues only that "Tarrant and/or Stelzer made and/or republished false statements regarding plaintiff in two written complaints, dated September 14 and November 12, 2013, to school administrators and other third parties, including Hardin, a Union Representative." Points not argued in the appellant's brief are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 23 (The Illinois Supreme Court has

"repeatedly held an appellant's failure to argue a point in the opening brief results in forfeiture under Supreme Court Rule 341(h)(7).").

¶ 34    And even after defendants addressed those two oral statements in their response brief, presumably out of an abundance of caution, plaintiff did not address them in her reply, either. So there is no doubt that she has forfeited these claims. We will not consider these oral statements further. We will focus on the written statements contained in the referenced exhibits.

¶ 35    We also do not address any of the allegedly defamatory statements contained in the first three complaints, *e.g.*, statements in plaintiff's performance appraisal, which were not in the third amended complaint and have been abandoned. See, *e.g.*, *Skarin Custom Homes, Inc. v. Ross*, 388 Ill. App. 3d 739, 745-46 (2009) (allegations in former complaints, not repleaded or incorporated in final amended complaint, are deemed waived). We further note that, although defendants addressed these additional statements in their response brief, plaintiff failed to do so in either her opening brief or reply brief.

¶ 36    So we will only consider (1) the written statements contained in Exhibit A to the third amended complaint (the September 2013 e-mails) and (2) the written statements contained in Exhibit B (Tarrant's grievance).

¶ 37                                1. September 2013 E-mails

¶ 38    On September 14, 2013, Tarrant sent an e-mail to the athletic director, Stelzer, and the assistant athletic director, Courtney Sakellaris, with the subject heading of "Big Problem," complaining about plaintiff's recent actions that Tarrant claimed were in violation of the signed written no-contact agreement. Tarrant also sent a copy of this e-mail to plaintiff's union representative, Sheila Hardin. Tarrant requested that the problem be taken care of or he would need to file a formal complaint with human resources.

¶ 39    Tarrant's September 14, 2013, e-mail, in its entirety, states as follows:

"Hey John and Courtney. I hate to report this, but it has to be done.

Every morning when I get up I open my closet and get my gear. On the door is the paper I was advised to sign by my union rep outlining what I was accused of last year regarding Danielle Dobias. I look at it every day so I am reminded to be smarter than last year. I signed even though I knew it was all B.S.

Today at my meet at Marmion Daniel [*sic*] Dobias showed up. Not only did she show up, she also walked into my camp, and was at the finish line where the racers and I meet. She was grabbing my runners, giving them advice, talking to my parents at the awards ceremony and generally was a huge distraction for myself and my athletes. This is totally unfair. This fired up more questions from Parents and athletes. On a day I should have been celebrating my first win and my seniors['] first win in their careers the moment was ruined. I have documented other items as well, but these were not as egregious. She exits the building daily thru the athletic doors, as you know we meet in the 1 east classroom. She almost knocked my [*sic*] over last Monday. Also Friday September 6th I parked in the garage for the 7[ ] am coaches['] meeting. When I came out her car was right across from mine. A clear violation of the agreement I signed.

I asked for a change last year because the coach was verbally and physically aggressive towards me, made inappropriate contacts with athletes, and met with athletes without my knowledge, and was not supportive of our program even as our team improved.

I need to have this taken care of ASAP or I will need to go to HR and file a formal complaint. I have done everything I can to avoid this person including leaving a job I loved and move out of the building into unfamiliar territory that will most likely lead to a lower evaluation next year.

So when I look at that letter I hated to sign I sound like a stalker. My question is. Who is stalking who?

I am prepared to bring forth solid evidence that as a coach this person did the following:

1) Celebrated an athlete[']s accomplishment by drinking alcohol.

2) Was rolling around on a bed in a hotel alone with an athlete as witnessed by another coach who walked in.

3) Was called after 2 am by athletes who were drunk and high. Went to where the athletes were. Hung out with them then took them home without notifying parents or the athletic office.

The above were not done under my guidance as head coach. I did not want any more trouble after last year however I am prepared to protect myself and my athletes from this person.

I have a 13 year old daughter, and if any coach did the unsafe things this coach has done I would be an extremely irritated parent.

Tom."

¶ 40    Stelzer forwarded Tarrant's e-mail, on September 16, 2013, to two (interim) human resource directors, Frank Bogner and John Carlson after discussing it with Nate Rouse, the OPRF principal. In his e-mail, Stelzer stated:

"John and Frank,

Per Nate's recommendation, I am forwarding you this email, please read and feel free to contact me with questions/concerns. There is too much to tell regarding this issue in an email. Suffice it to say, these two employees have a history, and the most recent events were dealt with last spring by Dr. Isoye. I am not sure how to handle this new situation. Please let me know when you are available to meet on this matter.

Thank you.

John Stelzer."

¶ 41 Plaintiff attached a copy of these e-mail messages to her complaint as "Exhibit A." Plaintiff alleged that Tarrant's written complaint charging her with verbal and physical aggression and violating the signed written no-contract agreement was "false." She also alleged she became the subject of a human resources investigation of Tarrant's complaint that required her to answer questions and make a statement about the charges. Plaintiff received a written reprimand even though, according to the complaint, Tarrant's allegations "were determined to be unfounded, and therefore false."

¶ 42                                      2. November 2013 "Grievance"

¶ 43 On November 12, 2013, Tarrant filed a "grievance" against plaintiff, a copy of which plaintiff attached to her complaint as "Exhibit B." The document states:

"Confidential State Meet,

I am filing a grievance against Danielle Dobias for intimidation and harassment based on the following event.

On Saturday November 9, 2013 Danielle Dobias knowingly and purposely disrupted my team preparation for the State Cross country Championships held at Detwieller Park. At approximately 12:00 pm Danielle Dobias entered our team camp area just as we were preparing our warm up. During this time I address my team and begin the mental process of preparing for the biggest race of the season and for all my athletes the biggest race of their careers. During this time Ms. Dobias engaged athletes and parents. It created such an awkward moment that I and parents left the area. Ms. Dobias then disrupted the post race gathering by again coming into our meeting area and engaging with the athletes before I released them to do the cool down. For the next several hours Ms. Dobias hung around our team camp area engaging athletes, placing her just a few feet away from me. This is clearly intimidation and harassment.

Ms. Dobias is well aware of cross country protocol and knows what she did was a violation of that protocol. It is the equivalent of walking into the football coaches' pregame speech/half time talk, or standing on the sidelines as opposed to being in the stands. I felt threatened and intimidated. This event follows several other intimidation attempts that I have documented with the HR department. I would have had no issues or right to file a complaint if Ms. Dobias had been a spectator in the race. I probably would not have even seen her there if that was her intent. It is clear that her intent was to harass and intimidate me. These events have affected my ability to teach and coach at OPRF to my full capabilities.

The following is a series of the major documented events leading to this complaint:

1) Left her classroom assignment and verbally assaulted me for over 15 minutes last year over my cross-country program.

2) Physically assaulted me by grabbing my arm and trying to force me into a room at the end of the school day.

3) Entered my work space again demanding changes to the XC program

4) After it was clear I would not likely have her back as a coach filed false reports about me in March 2013, over 4 full months after the season ended.

5) Entered the Team camp area and finish area at the Marmion invite this season

6) Sat next to me at the Climate survey assembly forcing me to move per agreement I signed

7) Knowingly entered the technology repair area I was required to be in for no reason 2 weeks ago

I believe the series of events paints a very clear picture of intentionally intimidating and harassing. In short I feel unsafe and threatened. Ms. Dobias drove over 300 miles to disrupt my team. This is scary to me and my family and has made it very difficult to perform my job at 100 percent.

I have the utmost respect for the leadership in the building and have done everything asked of me to rectify this situation. I am hoping my superiors will

realize it is now nearly impossible for me to follow the directive I signed on March 6, 2013 due to the above incidents. I am also hoping a pattern is emerging that is clear. I am asking building leadership to respond to this immediately. I respectfully request the following:

> 1) I respectfully request the letter in my file be removed or revised. It should be clear that I cannot abide by it's [*sic*] terms if Danielle Dobias continues to put herself in my path on a near weekly basis
>
> 2) I respectfully request *** a full review of the actions taken against me in light of the patterns of behaviors
>
> 3) I respectfully request a clear follow up to the actions taken due to these events
>
> 4) I respectfully request that clear parameters are put in place for the track season. I cannot see how her coaching in my area will be possible given the past behaviors.
>
> Finally, I just want to do my job and be a professional at OPRF. I have always felt my bosses have been supportive and professional. I am counting on that in this case again.
>
> Respectfully Submitted,
>
> Tom Tarrant."

¶ 44    Plaintiff alleged that she again became the subject of a human resources investigation of these "false" accusations, which required her to make a statement about the charges. According to plaintiff, Tarrant's allegations "were determined to be unfounded, and therefore false."

¶ 45                               E. Publication of Statements

¶ 46    Plaintiff alleged that her union contract, styled "Agreement between The Oak Park and River Forest High School District 200 and The Oak Park and River Forest High School Faculty Senate, IEA/NEA" (union contract), required that Tarrant first bring his complaint to the attention of his immediate supervisor, Stelzer. Plaintiff attached a copy of the union contract to her complaint as "Exhibit C." Plaintiff alleged that Tarrant violated the union contract by sending his e-mail complaint and grievance to other individuals who were not his immediate supervisor. Plaintiff further claimed that Tarrant and/or Stelzer inappropriately sent the documents to Hardin, Rouse, Sakellaris, Bogner, and Carlson.

¶ 47                              F. Circuit Court's Ruling

¶ 48    On February 26, 2015, the circuit court dismissed all counts of the third amended complaint with prejudice pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)) for failing to state a cause of action. On July 7, 2015, the court denied plaintiff's motion for reconsideration and clarification. The trial court agreed with defendants that the statements at issue were capable of innocent construction. The trial court also found that the statements were opinion and were not highly offensive to a reasonable person. This appeal followed.

¶ 49                              II. ANALYSIS

¶ 50    A motion to dismiss under section 2-615 challenges the legal sufficiency of a complaint. *Bonhomme v. St. James*, 2012 IL 112393, ¶ 34. Our review is *de novo*. *Id*. As noted earlier, we must accept as true all well-pleaded facts in the complaint, as well as all reasonable inferences that can be drawn from those facts. *Imperial Apparel, Ltd.,* 227 Ill. 2d at 384. A motion to dismiss, however, does not admit allegations in the complaint that are in conflict with the facts

disclosed in the exhibits. *Farmers Automobile Insurance Ass'n v. Danner*, 394 Ill. App. 3d 403, 412 (2009).

¶ 51                                 A. Count I: Defamation *Per Se*

¶ 52     Plaintiff first argues that the circuit court erred in granting defendants' section 2-615 motion to dismiss count I of the third amended complaint for defamation *per se*. The preliminary construction of an allegedly defamatory statement is a question of law, and our review therefore is *de novo*. *Green v. Rogers*, 234 Ill. 2d 478, 492 (2009).

¶ 53     To state a claim for defamation, a plaintiff must allege facts that show: (1) the defendant made a false statement about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) the publication caused her damages. *Green*, 234 Ill. 2d at 491. A defamatory statement is one that harms a person's reputation to the extent that it lowers the person in the eyes of the community or deters the community from associating with her or him. *Id*. There are two types of defamation: defamation *per se* and defamation *per quod*. *Stone v. Paddock Publications, Inc.*, 2011 IL App (1st) 093386, ¶ 24. Here, plaintiff has only alleged defamation *per se*, and we will confine our analysis accordingly.

¶ 54     A statement is defamatory *per se* where the harm to a person's reputation is obvious and apparent on its face. *Green*, 234 Ill. 2d at 491. If a plaintiff claims that a statement constitutes defamation *per se*, the plaintiff need not plead or prove actual damages, because the statement is considered so obviously and materially harmful that injury to the plaintiff's reputation may be presumed. *Green*, 234 Ill. 2d at 495; *Tuite v. Corbitt*, 224 Ill. 2d 490, 501 (2006); *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996).

¶ 55     "In Illinois, there are five categories of statements that are considered defamatory *per se*: (1) words that impute a person has committed a crime; (2) words that impute a person is infected

with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Green*, 234 Ill. 2d at 491-92. The first four categories were recognized under our common law; the fifth category was added by statute. See *Bryson*, 174 Ill. 2d at 88-89; 740 ILCS 145/1 *et seq*. (West 1992). Plaintiff raises only the first, third, and fourth categories.

¶ 56 Even if an alleged statement falls into one of these categories, the statement may not be actionable. A defendant may avoid liability if he can demonstrate: (1) that the statement is reasonably capable of an innocent construction (*Hadley v. Doe*, 2015 IL 118000, ¶ 31; *Green*, 234 Ill. 2d at 499); (2) that the statement is an expression of opinion (*Hadley*, 2015 IL 118000, ¶ 33); or (3) that the statement is subject to a privilege. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 585 (2006); *Pompa v. Swanson*, 2013 IL App (2d) 120911, ¶ 26.

¶ 57 First, a statement that may appear to be defamatory will not be actionable if it is capable of a reasonable, innocent construction. *Green*, 234 Ill. 2d at 500. Although a court must accept as true the facts alleged in the complaint, we are not required to accept plaintiff's *interpretation* of the statements as defamatory *per se*, because the meaning of a statement "is not a fact that can be alleged and accepted as true." *Tuite*, 224 Ill. 2d at 510. Accordingly, the preliminary determination of whether a statement is capable of a reasonable, innocent construction is properly a question of law for the court to decide *de novo*. *Id.*; *Bryson, Inc.*, 174 Ill. 2d at 90.

¶ 58 The court must give the allegedly defamatory words, and any implications arising from them, their natural and obvious meaning. *Green*, 234 Ill. 2d at 499. The innocent-construction rule does not apply simply because the allegedly defamatory words are "capable" of an innocent

construction. *Bryson*, 174 Ill. 2d at 93. "Only *reasonable* innocent constructions will remove an allegedly defamatory statement from the *per se* category." (Emphasis in original.) *Id.* at 90.

¶ 59 The context of the statement is critical, "as a given statement may convey entirely different meanings when presented in different contexts." *Green*, 234 Ill. 2d at 499; see also *Tuite*, 224 Ill. 2d at 512 (innocent-construction rule requires writing to be read as whole). Courts must "interpret the allegedly defamatory words as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader." *Bryson*, 174 Ill. 2d at 93; *Hadley*, 2015 IL 118000, ¶ 31.

¶ 60 If, when taken in context, a statement is *reasonably* capable of a nondefamatory interpretation, that innocent construction should be adopted. *Green*, 234 Ill. 2d at 500; *Anderson*, 172 Ill. 2d at 412-13. "There is no balancing of reasonable constructions ***." *Green*, 234 Ill. 2d at 500. On the other hand, if the defendant "clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement." *Id.*

¶ 61 Second, the law distinguishes between a defamatory statement of fact and an opinion; an expression of opinion is not defamation. See *Hadley*, 2015 IL 118000, ¶ 33; *Solaia Technology*, 221 Ill. 2d at 581. A false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole. *Hadley*, 2015 IL 118000, ¶ 33. "The test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact." (Internal quotation marks omitted.) *Id.* In analyzing whether a statement is a nonactionable expression of opinion or a defamatory statement of fact, the court considers "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." (Internal quotation marks omitted.) *Id.*; see also *Kumaran v. Brotman*, 247 Ill. App. 3d

216, 228 (1993) ("In determining whether a statement is one of fact or opinion, a court should consider the totality of the circumstances and whether the statement can be objectively verified as true or false."). A statement will receive first amendment protection from a defamation suit only if it cannot be reasonably interpreted as stating actual facts about the plaintiff. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 14-15 (1992).

¶ 62 The questions of whether a particular statement is subject to a reasonable, innocent construction, and whether it constitutes an opinion as opposed to fact, obviously must be determined on a statement-by-statement basis. Thus, we will take up those questions first, and then turn to the question of whether defendants were protected by a qualified privilege, a question that applies equally to all the statements communicated in a particular written document.

¶ 63  1. Statements Concerning Plaintiff's Interaction With Student-Athletes

¶ 64 We first consider defendant Tarrant's e-mail to defendant Stelzer on September 14, 2013, which Stelzer then republished two days later, which concerned three specific statements Tarrant made concerning plaintiff's interactions with student-athletes. We previously quoted the entire e-mail verbatim (*supra* ¶ 39) and will highlight only the relevant portion here. According to the exhibit attached to the complaint, defendant Tarrant wrote to defendant Stelzer (the athletic director), Courtney Sakellaris (the assistant athletic director), and Sheila Hardin (plaintiff's union representative) the following:

"I am prepared to bring forth solid evidence that as a coach this person did

the following:

1) Celebrated an athlete[']s accomplishment by drinking alcohol.

2) Was rolling around on a bed in a hotel alone with an athlete as witnessed by another coach who walked in.

3) Was called after 2 am by athletes who were drunk and high. Went to where the athletes were. Hung out with them then took them home without notifying parents or the athletic office.

The above were not done under my guidance as head coach. I did not want any more trouble after last year however I am prepared to protect myself and my athletes from this person.

I have a 13 year old daughter, and if any coach did the unsafe things this coach has done I would be an extremely irritated parent."

¶ 65    Plaintiff argues that each of these three statements above (conveniently numbered for us) constituted defamation *per se* under two different but related categories−words that impute a person is "unable to perform or lacks integrity in performing her or his employment duties" and words imputing that a person "lacks ability or otherwise prejudices that person in her or his profession." *Green*, 234 Ill. 2d at 492. As one court has observed, the difference between these two defamatory *per se* categories is "subtle." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013). "The former seems to imply some sort of on-the-job malfeasance; the latter covers suitability for a trade or profession." *Id.*; see also *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1226 (7th Cir. 1993) (describing former category as "malfeasance or misfeasance in the performance of an office or a job" and latter as "unfitness for one's profession or trade"). Plaintiff claims that each of these three statements imputed her lack of integrity as a school professional and otherwise prejudiced her in that profession.

¶ 66    Defendants argue that each of these three statements is capable of an innocent construction and, in any event, the statements were expressions of opinion and not fact.

¶ 67    We begin with the statement that plaintiff "[w]as rolling around on a bed in a hotel alone with an athlete as witnessed by another coach who walked in." Plaintiff claims that this statement is defamatory because, as a teacher and a coach, she is expected to be a role model for the students. She argues that Tarrant's statement imputed that she lacked integrity in her employment and/or prejudiced her in her trade as a teacher, because a teacher is expected to set a good example and to function as a role model for young, impressionable students.

¶ 68    Defendants, on the other hand, claim that this statement may be reasonably construed as mere "roughhousing." And defendants downplay the negative connotation attached to this statement by pointing to the conclusion of the e-mail, where Tarrant wrote that, if they knew of the complained-of conduct listed in the e-mail, parents would be "extremely irritated." Defendants claim that, if Tarrant were conveying the notion of sexual contact or even grossly inappropriate student-teacher contact, he would have predicted a far more aggressive reaction from parents than extreme irritation; he would have predicted that parents would demand criminal charges, remove their child from the cross-country team, storm a school board meeting in protest, or something of that nature. The circuit court agreed with defendants, finding this statement to be subject to an innocent construction and noting in its oral ruling that Tarrant "never said that the plaintiff was having sex with students."

¶ 69    We hold that this statement was not subject to a reasonable, innocent construction. A teacher rolling around on a bed with a student, when the two of them are alone in a hotel room, is inappropriate no matter how it could reasonably be viewed. While this statement may have fallen short of implying sexual intercourse, sexual behavior is not limited to intercourse. And even if

we could interpret this statement as describing purely nonsexual behavior, it is undeniably contact between a teacher and student-athlete that is far more intimate than would be appropriate. If the defendant "clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement." *Green*, 234 Ill. 2d at 500; see *Kumaran*, 247 Ill. App. 3d at 227 (statement that substitute teacher was "working a scam" by filing frivolous lawsuits to extract monetary settlements was defamation *per se* because "a teacher would be expected to set a good example and function as a role model for his young, impressionable students" and statement "prejudice[d] his teaching ability and integrity because it presented him as someone who would not be an acceptable role model for young students").

¶ 70    Defendants rely heavily on *Green* in support of their claim that Tarrant's statements are reasonably capable of an innocent construction. In *Green*, plaintiff alleged that defendant made statements that plaintiff had " 'exhibited a long pattern of misconduct with children which was not acceptable for [Little League] coaches' "; and had " 'abused players, coaches, and umpires in [Little League].' " *Green*, 234 Ill. 2d at 500. The court concluded that the alleged statements were reasonably capable of an innocent construction. *Id*. at 501. As the court explained: "These statements were made in the context of selecting coaches for the [Little League] season, and both statements were specifically confined to the context of Little League coaching." *Id*.

¶ 71    *Green* is factually distinguishable. While the statements in Green were confined to the context of Little League coaching, the accusation here that plaintiff was rolling around on a bed with a student-athlete, while they were alone in a hotel room, was not confined to the context of what plaintiff did on the track as a coach. And the court in *Green* noted that the alleged defamatory statements were immediately followed by multiple assurances from the defendants that, although the plaintiff would not be selected as a coach, he would be free to assist his son's

team with practices and pregame activities, and the plaintiff was "repeatedly and contemporaneously invited to participate in any way he could work out with his son's coach," which further clarified that the references to "abuse" or "misconduct" did not suggest anything of a sexual or immoral nature but rather misbehavior in the context of coaching. Here, in contrast, Tarrant referred to plaintiff's conduct as that from which he needed to "protect" himself *and* his athletes, and further noted that the "unsafe things" would extremely irritate him as a parent of a 13-year-old daughter.

¶ 72    The statement that plaintiff was rolling around on a bed in the privacy of a hotel room with a student-athlete clearly imputed a lack of integrity in her profession and prejudiced her in that profession. We can adopt no reasonable, innocent construction of this statement.

¶ 73    We turn next to Tarrant's statement attributing the following conduct to plaintiff:

> "Was called after 2 am by athletes who were drunk and high. Went to where the athletes were. Hung out with them then took them home without notifying parents or the athletic office."

¶ 74    In their effort to construct a reasonable, innocent construction of this statement, defendants argue that Tarrant merely stated that plaintiff "safely resolved a situation in which athletes were drunk and high." And the circuit court reasoned that Tarrant "never said that the plaintiff *** was drinking or doing drugs with" the students.

¶ 75    Both of those points have merit. But this passage must be read as a whole and in the context of the entire e-mail. *Green*, 234 Ill. 2d at 499; *Tuite*, 224 Ill. 2d at 512; *Bryson*, 174 Ill. 2d at 93; *Hadley*, 2015 IL 118000, ¶ 31. This passage, in full, also says that plaintiff "hung out with" the student-athletes that were drunk and high, and that she failed to notify either the parents or the athletic office of the underage drinking and drug use.

¶ 76    We fail to see how those statements can be innocently construed. While anyone would credit an adult who helped intoxicated students get home safely, the passage imputes that plaintiff, at a minimum, condoned the alcohol and drug use that took place in her presence. "Hanging out with" students cannot be reasonably construed as simply picking them up and taking them home; it means socializing with them while they were using these substances. Even if a teacher-coach did not herself use alcohol or drugs, it would reflect unfavorably on any teacher's reputation if she socialized with underage students while they were engaged in drug and alcohol abuse.

¶ 77    The presence of a favorable fact—getting the intoxicated students home safely—does not insulate the unfavorable statements from a claim of defamation. And again, the fact that Tarrant summed up his e-mail by referring to this conduct as "unsafe" behavior for which children required protection gives the lie to any claim by defendants that Tarrant was merely complimenting her on "safely resolv[ing]" a situation. We find no reasonable, innocent construction of this statement. These claims imputed a lack of integrity in plaintiff's profession and prejudiced her in that profession.

¶ 78    Nor can either of these two statements above be characterized as nonactionable opinion. The circuit court ruled that Tarrant's statement, at the end of the e-mail, that "if any coach did the unsafe things this coach has done I would be an extremely irritated parent"—was an expression of opinion, an argument defendants likewise raise before us. That particular, isolated statement may have been an opinion, but it does not change the fact that the two statements we have discussed above set forth specific facts—that plaintiff rolled around on a bed in a private hotel room with a student-athlete and "hung out" with student-athletes while they drank alcohol and used drugs. A defendant cannot avoid the defamatory statements he has made merely by

inserting his opinion of those facts alongside them. *Hadley*, 2015 IL 118000, ¶ 33; *Solaia Technology*, 221 Ill. 2d at 581. Whatever opinion Tarrant may have expressed about this complained-of conduct, the statements of fact themselves could be readily verifiable as true or false. See *Solaia Technology*, 221 Ill. 2d at 581; *Kumaran*, 247 Ill. App. 3d at 228 (distinguishing between fact and opinion based on whether, under totality of circumstances, statement can be "objectively verified as true or false").

¶ 79 We thus hold that the two statements made by Tarrant in the September 14, 2013 e-mail, accusing plaintiff of rolling around on a bed in a hotel room with a student-athlete, and accusing plaintiff of "hanging out" with student-athletes while they drank alcohol and used drugs, were defamatory *per se*.

¶ 80 Next, we consider Tarrant's statement in this same e-mail that plaintiff "[c]elebrated an athlete[']s accomplishment by drinking alcohol." This one is admittedly a close call. On the one hand, as defendants note, the statement does not literally accuse plaintiff of drinking alcohol *with* a student-athlete, or even in the presence of one. On the other hand, one might question why this incident would even be worth reporting if all that Tarrant meant was that plaintiff was drinking alcohol with other adults, or even by herself; there is nothing illegal or improper in doing so. If that was all that Tarrant intended to convey by this statement, why would he characterize it as "unsafe," feel compelled to protect children from such conduct, and find it necessary to distance himself from this behavior by emphasizing that her alcohol consumption "was not done under [his] guidance as head coach?" For that matter, if all that Tarrant meant was that plaintiff consumed alcohol outside the presence of student-athletes, why even mention that the reason she was drinking alcohol was to celebrate an athlete's success?

¶ 81    While plaintiff validly raised all of these questions, our duty is to adopt an innocent construction of the statement if it is reasonable to do so. *Green*, 234 Ill. 2d at 500; *Anderson*, 172 Ill. 2d at 412-13. We think it would be reasonable to innocently construe this statement. We do agree with plaintiff on one point: this statement can only be reasonably interpreted as implying that plaintiff drank the alcohol in the presence of athletes, because if it did not, there would be no point in including this statement in the e-mail at all.

¶ 82    But that does not necessarily mean that what plaintiff was accused of doing was illegal, immoral, or even objectively inappropriate. There is no law prohibiting adults from consuming alcohol in the presence of minors. It happens every day in restaurants, at professional sporting events, in backyard barbeques, in private homes, and the like. We have no context in this e-mail regarding the circumstances under which plaintiff consumed the alcohol—maybe, for example, the team went to a restaurant for a celebratory dinner after a successful outing—and while it may be possible to imagine situations where plaintiff's consumption of alcohol in the presence of her athletes would have been clearly inappropriate, we have already listed several examples where it would be perfectly legal and not inherently inappropriate.

¶ 83    We recognize that the statement here did not concern just any adult drinking in front of just any minor; the adult accused of drinking the alcohol was a high school teacher and coach, and the minors were her student-athletes. It could well have been Tarrant's subjective opinion that it is *never* appropriate for a coach to drink alcohol in front of his or her athletes. Others might subscribe to that view, too. But we think it would go too far to hold, as a matter of law, that the claim that a teacher-coach drank alcohol in the presence of her student-athletes, even in a perfectly legal and responsible context, would impugn a teacher-coach's professional integrity or

otherwise prejudice her in that profession. We hold that this statement was not defamatory *per se* and was properly dismissed as a claim of defamation in this case.[1]

¶ 84          2. Statements Concerning Plaintiff's Interaction With Tarrant

¶ 85    We next consider allegedly defamatory statements made by Tarrant regarding plaintiff's interactions not with athletes, but with Tarrant himself. In Tarrant's September 14 e-mail, he stated: "I asked for a change last year because [plaintiff] was verbally and physically aggressive toward me." In the November 12 written complaint, Tarrant wrote that plaintiff "[p]hysically assaulted me by grabbing my arm and trying to force me into a room at the end of the school day."

¶ 86    Plaintiff first argues that these statements impute the commission of a crime, a recognized category of defamation *per se*. Specifically, plaintiff contends that Tarrant imputed that she committed a battery. A person commits the crime of battery if she "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3 (West 2012).

¶ 87    Many decisions have held that, to constitute defamation *per se* based on imputing the commission of a crime, "the crime must be an indictable one, involving moral turpitude and punishable by death or by imprisonment in [lieu of a] fine." *Doe v. Catholic Diocese of Rockford*, 2015 IL App (2d) 140618, ¶ 46; *Kirchner v. Greene*, 294 Ill. App. 3d 672, 680 (1998); accord *Jacobson v. Gimbel*, 2013 IL App (2d) 120478, ¶ 27. One would not ordinarily think of verbal and physical aggression, or the grabbing of a coworker's arm to force him or her in a different direction, to be crimes of "moral turpitude." In other contexts, that phrase has been

---

[1]At oral argument, plaintiff's counsel conceded that this statement did not constitute defamation *per se*. We have chosen to consider the question in full regardless.

defined as " 'conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.' " *People v. Valdez*, 2015 IL App (3d) 120892, ¶ 21, *appeal allowed*, No. 119860 (Ill. Nov. 25, 2015) (quoting *In re Ajami,* 22 I. & N. Dec. 949, 950 (BIA 1999) (*per curiam*)). Thus, for example, this court has held that an accusation that the plaintiff committed the crime of "criminal housing management"—allowing residential real estate to fall into such deterioration that the lives of the inhabitants become endangered—was not libelous *per se*, and was properly dismissed, because the crime alleged was not one of moral turpitude. *Rasky v. Columbia Broadcasting System, Inc.*, 103 Ill. App. 3d 577, 583 (1981).

¶ 88     On the other hand, our supreme court has appeared not to limit crimes to those involving moral turpitude, or at least has not limited it explicitly. See *Van Horne v. Muller*, 185 Ill. 2d 299, 308 (1998) (accusation that plaintiff committed assault by accosting defendant in elevator and verbally threatening his life was defamatory *per se* under imputation-of-crime category); *Tuite*, 224 Ill. 2d at 501 (discussing imputation-of-crime category of defamation *per se* without requiring that crime be one of moral turpitude, though crime in that case was bribery of judicial officers); *Stewart v. Howe*, 17 Ill. 71, 72-73 (1855) (suggesting that accusation of crime of moral turpitude might be one basis for defamation but not explicitly limiting it to such crimes). We would further note, as an aside, that the Restatement provides that accusations of a criminal act are actionable if the criminal act is either punishable by prison *or* one involving moral turpitude. Restatement (Second) of Torts § 571 (1977).

¶ 89     We need not decide whether the crime must be one of moral turpitude under Illinois law, because we hold, in any event, that each of the two statements at issue is amenable to a

reasonable, innocent construction. See *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 586 (2005) (reviewing court may affirm dismissal of complaint on any basis in record).

¶ 90 First, the September 14 e-mail, which concerned past conduct that had been part of a previous dispute resolution between Tarrant and plaintiff, merely references "verbally and physically aggressive" behavior and does not even arguably suggest the commission of a battery. There is no specific claim of bodily harm or physical contact of any kind. That claim was properly dismissed.

¶ 91 The November 12 written complaint, where Tarrant claimed that plaintiff "[p]hysically assaulted [him] by grabbing [his] arm and trying to force [him] into a room at the end of the school day," is a closer question. We agree that the conduct described in this statement covered all of the elements for the misdemeanor crime of battery, as it constituted physical contact of an insulting or provoking nature. See 720 ILCS 5/12-3 (West 2012). In fact, though plaintiff failed to call as much to our attention, battery of a school teacher on school grounds, as alleged here, constitutes the Class 3 felony of aggravated battery. 720 ILCS 5/12-3.05(d)(3) (West 2012) (person commits aggravated battery if she commits battery on an individual she knows to be "[a] teacher or school employee upon school grounds").

¶ 92 We know these things because we are lawyers and judges, trained to research criminal statutes and case law. We know, for example, that the standard for a criminal battery is an extremely low one−that "*[a]ny* offensive touching of the person or clothing of the victim constitutes a battery." (Emphasis added.) *People v. Tiller*, 61 Ill. App. 3d 785, 795 (1978). Taking a box of matches away from the hand of another in anger has been held to constitute battery. *People v. Beifeld*, 171 Ill. App. 614, 615 (1912). Spitting on someone's arm is a battery.

*People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55 ("For hundreds of years, the common law has regarded deliberate spitting on someone as a battery.").

¶ 93    But we are not to read this statement through the eyes of a judge or attorney; we are to view this statement through the eyes of the "reasonable reader." (Internal quotation marks omitted.) *Hadley*, 2015 IL 118000, ¶ 31; *Tuite*, 224 Ill. 2d at 504; *Bryson*, 174 Ill. 2d at 93. The question is whether the statement "fairly impute[s] the commission of a crime" in the eyes of the reasonable reader. *Kirchner*, 294 Ill. App. 3d at 680; *Doe*, 2015 IL App (2d) 140618, ¶ 46.

¶ 94    Would a reasonable reader of this statement know that the complained-of acts constituted not only misdemeanor battery but, in fact, the Class 3 felony of aggravated battery? Tarrant himself did not; he called what happened an "assault." See *Tiller*, 61 Ill. App. 3d at 795 (offensive touching is a battery, not an assault). It is a fairly common misapprehension for the public (and sometimes even lawyers) to confuse the offenses of assault and battery, which only reinforces our concern.

¶ 95    While there is no doubt that Tarrant's statement checked all the boxes for the elements of a battery and even aggravated battery, it does not automatically follow that this would be fairly imputed from the standpoint of the reasonable reader. To use the examples of battery we have noted above, if Tarrant accused plaintiff of angrily yanking a book of matches from his hand, or spitting on his arm, we would not expect the community at large to brand her a criminal. We would not expect a reasonable reader to even think of those acts as crimes. Inappropriate, no doubt, but not crimes.

¶ 96    We believe the same could be said of the act for which Tarrant accused plaintiff. We would expect that a reasonable reader of this statement would not know that a teacher's act of grabbing a fellow teacher by the arm, during school hours on school property, in order to redirect

them to a room, in and of itself, is a criminal act, much less an aggravated form of a criminal act that elevated it from a misdemeanor to a Class 3 felony.

¶ 97    A reasonable person would clearly infer criminal conduct from a statement that a person is a murderer, a rapist, a child molester, even an embezzler or a thief, or from acts that fairly implied those criminal acts. We simply cannot accept that an employee's act of grabbing a coworker's arm to steer him into a room, in a workplace setting, without more, falls into that category.

¶ 98    We must emphasize that our analysis here is limited to these specific facts and surrounding context. See *Green*, 234 Ill. 2d at 499 ("context of the statement is critical"). There is no accusation that plaintiff tried to force Tarrant into a room for the purpose of committing a further act of aggression. Certainly, we could conceive of many situations where grabbing someone and redirecting their movement toward a private location would be suggestive of an intent to commit some further criminal act like robbery or sexual assault or even a more obvious form of battery—even murder—but in the context of this complaint, we see nothing remotely suggesting such a possibility. Rather, this statement concerns two coworkers arguing on school grounds during the school day, where one was trying to get the attention of the other in an admittedly inappropriate way, but nothing that makes this anything more than a heated moment between coworkers, among many such heated moments over the previous year.

¶ 99    We have long held that, to state a claim for defamation *per se* on this basis, the defendant need state the particularities of the elements of a crime, as would an indictment, so long as the statement fairly imputes the commission of a crime. *Kirchner*, 294 Ill. App. 3d at 680; *Doe*, 2015 IL App (2d) 140618, ¶ 46; *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 47 (1997). We think the converse must be true as well; just because the challenged statement might

technically state the elements of a crime, it does not necessarily follow that, to the reasonable reader, the commission of a crime has been fairly imputed. Most of all, we do not think that this accusation of plaintiff's conduct, inappropriate though it may have been, would so harm plaintiff's reputation that it lowered her in the eyes of the community or deterred the community from associating with her−which in the end is the standard for defamation. See *Green*, 234 Ill. 2d at 491.

¶ 100    We hold that Tarrant's statement that plaintiff "[p]hysically assaulted [him] by grabbing [his] arm and trying to force [him] into a room at the end of the school day" could be reasonably construed as not imputing the commission of a criminal offense. We affirm the dismissal of this claim as well.

¶ 101    Plaintiff also alleges, as she did with the previous allegations, that these statements constituted defamation *per se* because they challenged her integrity in her profession and otherwise prejudiced her standing in the profession. A generic description of verbal and physical aggression, and an isolated example of grabbing someone's arm to get his attention, may not be flattering statements, but they are not so harmful that they would lower plaintiff's reputation in the eyes of the community and deter the community from associating with her. See *Green*, 234 Ill. 2d at 491. Unlike two of the statements in Tarrant's e-mail regarding plaintiff's "unsafe" activities with students, the statements made by Tarrant in his grievance do not constitute statements impugning plaintiff's integrity as a schoolteacher and are not defamatory *per se*. See, *e.g.*, *Heying v. Simonaitis*, 126 Ill. App. 3d 157, 164-65 (1984) (when read in context, doctors' statements criticizing nurse for her personality conflicts with other hospital staff did not impugn her professional abilities as nurse or prejudice her in her profession and, thus, were not defamatory *per se*).

¶ 102   We hold that these statements regarding physical and verbal confrontations between plaintiff and Tarrant were not defamatory *per se*, and the claims of defamation based on these statements were properly dismissed.

¶ 103                                    3. Qualified Privilege

¶ 104   Thus far, we have held that only two statements made by Tarrant in the September 14, 2013, e-mail—that plaintiff was "rolling around on a bed in a hotel room with an athlete" and that plaintiff "hung out" with athletes who were drinking and using drugs—constituted defamation *per se*. We have held that all other statements at issue were properly dismissed, as they were not defamatory *per se*.

¶ 105   As to the two statements that have survived our analysis, we must next determine the question of qualified privilege. Defendants raised this issue in their motion to dismiss and argue the issue again before this court. The circuit court did not rule on the privilege issue. But we may affirm the circuit court's judgment on any basis contained in the record, regardless of whether it was the basis on which the circuit court relied. *Beacham v. Walker*, 231 Ill. 2d 51, 61 (2008).

¶ 106   A defamatory statement is not actionable if it is privileged. *Solaia Technology*, 221 Ill. 2d at 585. Privilege is an affirmative defense that may be raised as a basis for dismissal of a defamation action (*Anderson v. Beach*, 386 Ill. App. 3d 246, 248 (2008)), even in a section 2-615 motion if the defense is apparent on the face of the complaint. *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 18.

¶ 107   The qualified privilege in Illinois defamation law is based on "the policy of protecting honest communications of misinformation in certain favored circumstances in order to facilitate the availability of correct information." *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 24 (1993); *Pompa v. Swanson*, 2013 IL App (2d) 120911, ¶ 27. A qualified

privilege generally applies "where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection." (Internal quotation marks omitted.) *Solaia Technology*, 221 Ill. 2d at 599 (Freeman, J., concurring in part and dissenting in part) (quoting J.D. Lee & Barry A. Lindhal, Modern Tort Law § 36:32, at 36-47 (2d ed. 2002)).

¶ 108    But even if a privilege exists in a given case, defendant may not rely on that privilege if he abuses it. *Kuwik*, 156 Ill. 2d at 30. A plaintiff claiming a defendant abused a qualified privilege must show a direct intention to injure another or a reckless disregard of the plaintiff's rights and of the consequences that may result to the plaintiff. *Id*.; accord *Pompa*, 2013 IL App (2d) 120911, ¶ 26 (qualified privilege can be exceeded, and thereby defeated, in circumstances where defendant makes false statements with intent to injure or with reckless disregard for statements' truth). Conduct constituting an abuse of the privilege thus includes not only an intent to injure but also "any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties." *Kuwik*, 156 Ill. 2d at 30; see also Restatement (Second) of Torts § 599 cmt. a, at 286 (1977) (protection that qualified privilege gives to publication of defamatory matter can be defeated by unreasonable exercise of privilege).

¶ 109    The complaint sufficiently alleges an abuse of any qualified privilege that may have existed. As to both written documents containing the statements at issue, the complaint alleges that the statements were "false" and determined to be unfounded after an internal investigation, that they were "made and published in bad faith," and that "if the statements were protected by a qualified privilege, [d]efendants abused the privilege because the statements were false and [d]efendants *knew* that they were false and/or were not investigated prior to the statements[']

publication." (Emphasis added.) The complaint adds that the allegedly defamatory statements "were made with the knowledge of their falsity and with actual malice." We would further note that the complaint alleges that at least one of the defendants, Tarrant, acted as he did toward plaintiff as part of a "pattern of retaliation" after plaintiff rebuffed his romantic advances.

¶ 110   Because we accept these allegations as true at the pleading stage, we must find that the complaint sufficiently pleads an abuse of any possible qualified privilege. See, *e.g.*, *Colson v. Stieg*, 89 Ill. 2d 205, 215-16 (1982) (allegations that defendant had made subject statement "knowing it to be false" and that statement was made maliciously, willfully and intentionally was sufficient to defeat claim of privilege on motion to dismiss); *Id.* at 216 (allegation that defamatory statement was "false and that the statement was made knowing it to be false were sufficient allegations" to avoid dismissal against claim of privilege (citing *Weber v. Woods*, 31 Ill. App. 3d 122 (1975), with approval)); *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, ¶ 103 (complaint sufficiently alleged "ill-will" and "malice" to overcome privilege where plaintiff alleged retaliation against him for reporting alleged wrongdoing by defendants).

¶ 111   Because the complaint has sufficiently alleged that any qualified privilege that may have existed was abused, it is not necessary for us to decide whether such a privilege existed in the first place. We express no opinion on that question one way or other. We would only point out that, contrary to some of the argument from plaintiff on this issue, the question of qualified privilege is governed by our supreme court's decision in *Kuwik*, 156 Ill. 2d at 25-27, in which the supreme court adopted the Restatement (Second) of Torts §§ 593-599 (1977) for determining whether a qualified privilege exists and *abandoned* the five-element test previously applied in Illinois. See also *Barakat v. Matz*, 271 Ill. App. 3d 662, 668 (1995).

¶ 112   Plaintiff has raised two additional arguments as to why defendants abused their qualified privilege, namely, that they published the statements (1) for an improper purpose and (2) to improper parties. In view of our determination that plaintiff sufficiently pleaded abuse of the qualified privilege, we need not address these arguments. Plaintiff will be free to argue these points in the circuit court on remand, just as defendants may raise the issue of qualified privilege below.

¶ 113   We reverse the trial court's dismissal of count I of the third amended complaint insofar as it dismissed the claims related to the two statements we have found were defamatory *per se*, the statement concerning plaintiff rolling around on a hotel bed with a student, and the statement concerning plaintiff "hanging out" with intoxicated students. As to any and all other statements alleged as defamatory in count I, we affirm the dismissal of the third amended complaint.

¶ 114                     B. Count II: False-Light Invasion of Privacy

¶ 115   To state a cause of action for false-light invasion of privacy, a plaintiff must allege that: (1) the plaintiff was placed in a false light before the public as a result of the defendants' actions; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 17-18 (1992); *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 419-23 (1989).

¶ 116   In their motion to dismiss count II, defendants noted that plaintiff's false-light claim was based on the same alleged false statements on which her defamation claim was based. Defendants argued that, as a result, the false-light claim suffered from the same fatal deficiencies that defendants had raised regarding count I. Likewise, in dismissing count II for false-light

invasion of privacy, the trial court stated: "As the defamation count falls, so does the false-[light] count. These statements taken in context are not highly offensive to a reasonable person. These statements are subjectively offensive to the plaintiff because she wants to settle a score with the track coach." We have now held that two of Tarrant's statements in count I were defamatory *per se* and that count I should not have been dismissed to that extent.

¶ 117    In *Tuite*, 224 Ill. 2d 490, as in the instant case, the plaintiff's false-light invasion of privacy claim was based on the defamatory *per se* nature of the statements. The appellate court held that the failure of the plaintiff's defamation *per se* claim required the dismissal of his false-light claim. *Id*. The Illinois Supreme Court, however, reversed the dismissal of the plaintiff's defamation *per se* claim and explained that it therefore followed "that the dismissal of his false light invasion of privacy claim must also be reversed." *Id*. at 515.

¶ 118    We believe the same reasoning applies here. We reverse the dismissal of count II of the third amended complaint insofar as it relates to the two statements we have found to constitute defamation *per se*, and in all other respects we affirm its dismissal.[2]

¶ 119                                   III. CONCLUSION

¶ 120    For the reasons stated, we reverse the judgment of the circuit court of Cook County and remand for further proceedings consistent with this opinion.

---

[2] In their response brief, defendants argue that plaintiff's action is barred by section 2-210 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-210 (West 2012)), which states that "[a] public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material." Defendants contend that Tarrant was acting in the scope of his employment and his statements provided information.

But defendants did not raise, brief, or argue the affirmative defense of immunity under the Tort Immunity Act in the trial court. The trial court, therefore, did not enter any order on this issue or even address it. "It is well settled that 'issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal.' [Citations.]" (Internal quotation marks omitted.) *Mauvais-Jarvis*, 2013 IL App (1st) 120070, ¶ 102. Although we recognize that we may affirm the trial court's judgment on any basis appearing in the record, the issue has not been fully developed in the record before us. We believe that it would be premature for us to address the merits of this issue until it has. See *id.* ¶ 103.

¶ 121   Reversed and remanded.