2020 IL App (2d) 180654
No. 2-18-0654
Opinion filed June 25, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| ARTHUR G. JAROS, JR., | ) | Appeal from the Circuit Court |
| | ) | of Du Page County |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-CH-1233 |
| | ) | |
| THE VILLAGE OF DOWNERS GROVE; | ) | |
| SUSAN D. FARLEY; LEAGUE OF WOMEN | ) | |
| VOTERS OF DOWNERS GROVE, | ) | |
| WOODRIDGE, AND LISLE; | ) | |
| GREGORY W. HOSÉ, Individually and in | ) | |
| his Official Capacity as Commissioner of the | ) | |
| Village of Downers Grove; ROBERT T. | ) | |
| BARNETT, Individually and in his Official | ) | |
| Capacity as Commissioner of the Village | ) | |
| of Downers Grove; and MARTIN T. TULLY, | ) | |
| Individually and in his Official Capacity as | ) | |
| Mayor of the Village of Downers Grove, | ) | Honorable |
| | ) | Paul M. Fullerton, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1    In September 2017, the village council of Downers Grove (Council) removed plaintiff,

Arthur Jaros, from his seat on the board of trustees for the Downers Grove Public Library (Board).

The impetus for the removal was a report, written by Susan Farley of the League of Women Voters

of Downers Grove, Woodridge, and Lisle (League) and published by the League, stating that

plaintiff made bigoted comments at the Board's August 2017 monthly meeting (August 23 meeting). Seeking redress for both the report of his comments and his removal from the Board, plaintiff sued multiple defendants, including the Village of Downers Grove (Village), Farley, the League, Gregory Hosé and Robert Barnett, who were members of the Council, and Martin Tully, who was the Village mayor. On the motion of defendants, the trial court dismissed plaintiff's first amended complaint with prejudice. The court later denied plaintiff's motion for leave to file a second amended complaint. Plaintiff appeals, raising multiple issues. We affirm.

¶ 2                                I. BACKGROUND

¶ 3     On September 5, 2017, plaintiff filed his original complaint. Along with the complaint, plaintiff filed a motion for injunctive relief, seeking to bar the Council from voting that evening on a resolution to remove plaintiff from the Board. The trial court heard the motion that same day and denied it as premature. That evening, the Council adopted the resolution to remove plaintiff from the Board.

¶ 4     On September 6, 2017, plaintiff filed a seven-count amended complaint against the originally named defendants. In the complaint's general allegations, plaintiff stated that, in August 2015, he was appointed by the Council to a six-year term on the Board. See 75 ILCS 5/4-2 (West 2014) (the village council appoints library trustees). Plaintiff alleged that the position of library trustee is nonpartisan, that he served as trustee "without any political affiliation," and that he is "not a precinct committeeman or other type of official or employee of any political party."

¶ 5     Counts I and II alleged defamation. Count I named Farley and count II named the League on a *respondeat superior* theory. Plaintiff alleged that, on August 23, 2017, the Board met for its regular monthly meeting. All six trustees, including plaintiff, were present. Also present were the Village library's chief executive officer, Julie Milavec, and various library staff, including Katelyn

Vabalaitis, who was acting as recording secretary for the meeting. Present as a spectator was Farley, a member of the League. Neither Hosé, Bartlett, nor Tully were present. On the meeting's agenda was the final version of a "Strategic Plan" (Plan) for the Village library. Plaintiff attached excerpts of the Plan to his complaint. One section of the Plan read:

"**Goal: We reflect the diversity of our community**

**Objective: To be inclusive in providing service to the community**

| Action | Point Person | Target Date |
|---|---|---|
| [1] Provide regular training for all staff in equity, diversity, and inclusion | Managers | Annual |
| [2] Incorporate inclusive practices into library services | Managers | Annual |
| [3] Create a diversity strategy for hiring that reflects the community | Julie Milavec | December 2019 |

¶ 6    Plaintiff alleged that the discussion of the Plan resulted in changes to the three proposed action items, including removing action item (2) and rewording action items (1) and (3). With these changes, the Plan was approved. Following the meeting, the League published on the Internet Farley's "Observer's Report" (Report) of the August 23 meeting. Plaintiff attached the Report to his complaint. In the Report, Farley summarized plaintiff's comments on the three action items:

"(1) Jaros expressed his objection to Action Item 2. He specifically identified that this statement: 'Staff would receive training in Equity, Diversity and Inclusion,' in his opinion, did not meet the Affirmative Action requirement and Staff should be hired only by merit. He questioned why Library staff needed to be trained in any of these areas (Equity, Diversity or Inclusion). He stated he objected to Staff, who would be around

children, receiving any training in how to handle inclusion. Should the staff be trained in Inclusion, Jaros continued, it would open the library up to problems. The children, in his opinion, had to be protected by library staff from inclusion by ignoring its existence. He then proceeded to read out loud word by word from what he stated was the Illinois School Code, IL Sex Education Section to the Board members. Jaros re-stated a second time to further emphasize, after completing the reading of the ISC Sex Education Section, the ISC specifically states a marriage is only between a man and a woman. He personally commented that the code he read did not recognize homosexual marriage and he felt the Library must not either. The Staff had to protect the children from homosexuals and exposure to homosexual life style. He proceeded to continue to express his personal views on how we should view straight people vs. gays and reject any inclusion and people different from white straight people.

[Jaros] further commented that he felt library staff did the Board a disservice by inserting the 3 Action Items in the Strategic Plan without prior review by the Board. As he [was] just reading them at the meeting, he felt unprepared to fight their very existence in the Plan.

\* \* \*

(5) Jaros stated he would be voting 'no' to the entire Strategic Plan if Action Item 2 remained as presented. He also commented he would really like to eliminate all 3 Action Items until they could be properly reworded by him. Jaros suggested replacing the word 'hiring' in Action Item 3 with 'recruiting' and was concerned this Action Item 3 would not obtain the best candidate for the library staff due to its statement about diversity.

\*\*\*

(7) Jaros stated his objection to the library staff creating any reading lists for distribution as they might pick authors that were too diverse and not, in his opinion, a true reflection of writers he felt were appropriate for children."

¶ 7        According to the Report, the Board ultimately voted to remove action item (2) and reword action item (3).

¶ 8        Plaintiff specified the following portion of the Report as defamatory:

"He [Jaros] proceeded to continue to express his personal views on how we should *** reject any *** people different from white straight people."

Plaintiff asserted that this statement (reported statement) "was false in its use of the term 'white' " and also "false in its ascribing to Plaintiff a statement concerning rejecting any people."  Plaintiff denied making any mention of "race or skin color" at the August 23 meeting.  Plaintiff alleged that Farley made her report "with reckless disregard for the truth and, therefore, with malice."

¶ 9        Plaintiff alleged that the reported statement prompted users of social media to attack him as "bigoted" towards persons of other races and sexual orientations.  Plaintiff asserted that he was an attorney by occupation and that the reported statement "injured [his] reputation" as a member of the bar.  He also claimed damage to his general reputation in the Village.

¶ 10       Plaintiff also attached to his complaint an email he sent to Tully on August 27, 2017.  In this email, plaintiff provided his own account of the Board's "animated discussion" of the Plan's action items.  Plaintiff wrote:

"With respect to the first action item, my concern was for indoctrination of staff— particularly staff of the children's department—in the 'political correctness' associated with the activist, 'progressive' left in this nation.  'Equity' 'diversity' and 'inclusion' can

easily be interpreted as code words for anything goes, no matter how vulgar or otherwise against community values.

I specifically pointed out that with respect to the children's department, we must be careful to reflect the policy preferences of the State of Illinois. I explained that with respect to school age children, the law *** continues to require public school instructional materials to 'teach honor and respect for monogamous heterosexual marriage.' The law— despite recent amendment of [the] School Code *** and despite recent legislation permitting in Illinois homosexual statutory marriage *for adults*—does not mandate *for the teaching of our children* anything comparable with respect to 'honor and respect' for other statutory forms of 'marriage. The maxim 'expressio unius est exclusio alterius' in my view is operative here.

I therefore explained that *with respect to children*, our law does not adopt diversity and inclusion as to different forms of marriages but instead singles out 'monogamous heterosexual marriage' for preferential treatment with respect to teaching of school age children. I also explained that unbridled diversity and inclusion can easily be read to mean that practices outside the American mainstream might now have to be given equal treatment under the principles of diversity and inclusion including advocacy of forcible imposition of Shariah law and cannibalism. (Those were the two I named). I could have added a host of others including the practice of incest, bestiality, female genital mutilation *** and honor killings ***. I explained that I could not vote for approval of [the Plan] with these three action items being so loosely drafted as to permit such interpretations to be made by staff and/or library patrons. President [Wendee] Greene then stepped in an[d] helped negotiate a compromise acceptable to all six trustees.

The action items, as added by the staff without warning to the Board, reflect the radical left values of the American Library Association.

* * *

It was agreed that the second action item—in my opinion vague as drafted—was unnecessary for [the Plan] to be adopted and the Board, as a compromise, agreed to temporarily delete that item altogether with a view to reworking the language at a later date and perhaps adding a different formulation of the second action item back into [the Plan] by amendment at some future meeting." (Emphases added.)

¶ 11 In count III, plaintiff named Hosé and alleged defamation based on republication. Plaintiff stated that, sometime prior to September 1, 2017, Hosé republished the Report on his Facebook page and called for the Council to remove plaintiff as library trustee. Plaintiff attached to his complaint a screenshot of Hosé's Facebook post.

¶ 12 Count IV of the amended complaint named the Village and sought a declaratory judgment that section 2.53.1(d) of the Village code (Downers Grove Municipal Code § 2.53.1(d) (amended June 5, 2007)), which authorized the Board to remove library trustees, exceeded the Village's home-rule powers. Count V named the Village, Hosé, Barnett, and Tully. In this count, plaintiff sought preliminary and permanent injunctive relief to bar the Board from removing plaintiff as library trustee.

¶ 13 Count VI, naming Hosé and the Village, alleged a violation of plaintiff's free-speech rights under the Illinois Constitution (Ill. Const. 1970, art. I, § 4). Plaintiff asserted that his statements at the August 23 meeting were constitutionally protected speech and that his rights were violated when the resolution to remove him from the Board was adopted.

¶ 14    Count VII named Hosé, Barnett, and Tully and alleged a conspiracy to deprive plaintiff of his free-speech rights under the Illinois Constitution.  Plaintiff alleged that these defendants acted in concert to seek plaintiff's removal for his constitutionally protected statements at the August 23 meeting.

¶ 15    On September 7, 2017, plaintiff filed a petition for a preliminary injunction in connection with count V.  Plaintiff sought to bar defendants from enforcing the resolution to remove him from the Board.  On September 21, the trial court denied the petition, finding no likelihood of success on the merits.  The court further determined that its denial of injunctive relief under count V "was tantamount to a judgment declaring that section 2.53.1(d) of the Village code, authorizing [the Council] to remove members of [the Board], was within the Village's home-rule powers." *Jaros v. Village of Downers Grove*, 2017 IL App (2d) 170758, ¶ 11.  On September 21, plaintiff filed an interlocutory appeal under Illinois Supreme Court Rules 304(a) (eff. Mar. 8, 2016) and 307(a) (eff. July 1, 2017).  On February 16, 2018, this court issued its opinion affirming the trial court. *Jaros*, 2017 IL App (2d) 170758, ¶ 50.

¶ 16    While the appeal was pending, defendants filed motions to dismiss counts I, II, III, VI, and VII of the complaint.  Defendants filed their motions pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)), which permits a defendant to seek dismissal based on both section 2-615 (*id.* § 2-615) (dismissal based on failure to state a claim) and section 2-619 (*id.* § 2-619) (dismissal based on defects, defenses, or other affirmative matter) of the Code.

¶ 17    In their joint motion to dismiss counts I and II (defamation), Farley and the League argued that the reported statement was neither defamatory *per se* nor defamatory *per quod*.  See *Hadley v. Subscriber Doe*, 2014 IL App (2d) 130489, ¶ 19 ("A statement is defamatory *per se* if its

defamatory character is obvious and apparent on its face and injury to the plaintiff's reputation can be presumed," while "[a] statement is defamatory *per quod* if the defamatory character is not obvious and apparent on its face," in which case reputational damage is not presumed and the plaintiff must plead and prove special damages). Farley and the League also noted that, because plaintiff was a public official, he was required to plead and prove that Farley and the League made the allegedly defamatory statement with actual malice, *i.e.*, with knowledge of its falsity or in reckless disregard for its truth or falsity (*Tirio v. Dalton*, 2019 IL App (2d) 181019, ¶ 58 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964))). Farley and the League argued that plaintiff did not properly allege that they acted with actual malice.

¶ 18    Farley and the League also asserted the affirmative defense of substantial truth.[1]   For support, Farley and the League attached the official minutes of the August 23 meeting. The minutes record plaintiff's comments on the Plan's three action items:

> "Regarding Action Item 1 and 2, Jaros brought up the Illinois School Code and the requirements for schools in what can be included in sex education classes. He stated that equity, diversity, and inclusion are part of a left wing political agenda and these action items espouse a progressive agenda and viewpoint. Jaros stated children's librarians should not provide booklists or services that support same sex marriage and that same sex marriage is lesser than heterosexual marriage.  He stated that support of inclusive practices would

---

[1] "While 'substantial truth' can be an affirmative defense to a defamation suit, falsity is also an element of the defamation plaintiff's cause of action." *Tirio*, 2019 IL App (2d) 181019, ¶ 52.

mean supporting all kinds, including 'terrorists' and 'cannibalism.' He believes the library should be inclusive, but only the good kind."

¶ 19  The minutes reflect that the Board agreed to revise action item (1) and to temporarily remove action item (2) and place it for discussion at a future meeting. The action items were, as modified:

"1. Provide regular patron service training for all staff in equity, diversity, and inclusion.

2. Create a diversity strategy for recruiting that reflects the community."

¶ 20  Farley and the League also attached a copy of Farley's handwritten notes, from which she purportedly derived the Report. Farley wrote in her notes: "Focus on straight white people v. gay people."

¶ 21  Farley and the League argued that the reported statement was substantially true in light of plaintiff's comments in the email to Tully and the official minutes of the August 23 meeting. Based also on these independent sources, Farley and the League invoked the fair-report privilege. See *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 588 (2006) ("[T]he fair report privilege has two requirements: (1) the report must be of an official proceeding; and (2) the report must be complete and accurate or a fair abridgement of the official proceeding."). Finally, Farley and the League asserted that plaintiff's suit was a "Strategic Lawsuit Against Public Participation" (SLAPP) and thus barred by the Citizen Participation Act (735 ILCS 110/1 *et seq.* (West 2016)).

¶ 22  In his motion to dismiss count III (defamation: republication), Hosé argued that plaintiff did not sufficiently allege that Hosé republished Farley's account with actual malice. Hosé also asserted the affirmative defense of legislative immunity.

¶ 23    In their joint motion, the Village, Hosé, Barnett, and Tully argued for dismissal of counts VI and VII (free speech) on the ground that the free-speech protections of the Illinois Constitution did not apply to plaintiff's remarks at the August 23 meeting, because he was speaking as an "appointed official on matters relating to his official duties" and not as a "citizen *** about a matter of public concern." They also argued that the Illinois Constitution does not permit a claim for damages for a violation of free-speech rights. Finally, they asserted common-law immunity as well as statutory immunity under sections 2-109 and 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-109, 2-201 (West 2016)).

¶ 24    In his responses to the motions to dismiss, plaintiff clarified that he was claiming strictly that the reported statement was defamatory *per se*. According to plaintiff, the reported statement harmed him both in his "calling as library board trustee" and in his occupation as attorney.

¶ 25    On April 4, 2018, the trial court heard the motions to dismiss. The court dismissed the entire complaint. The court stated that it was granting the dismissal according to both sections 2-615 and 2-619, but added that, if the section 2-619 grounds had not been adequate in themselves for dismissal, the court would have permitted plaintiff to replead. As the complaint stood, however, the court dismissed it with prejudice.

¶ 26    Regarding counts I and II, the court agreed with Farley and the League that the reported statement was not defamatory *per se* because plaintiff alleged "nothing *** that's defamatory regarding [his] inability to perform his office as a library trustee and nothing *** concerning his ability to perform as an attorney." At worst, the reported statement portrayed plaintiff as "somehow a racist," which "in and of itself is not defamation." The court also found that counts I and II lacked "sufficient facts" in alleging actual malice and provided only "conclusions."

¶ 27    As for the affirmative defenses to counts I and II, the court declined to dismiss on the ground of substantial truth, because there "could possibly be facts that may be present."  The court did accept, however, the fair-report privilege as a basis for dismissal.  Specifically, the court found that the reported statement was a "fair and accurate report" of the August 23 meeting, given the "anti-inclusive statements" appearing in the two additional: the official minutes of the August 23 meeting and plaintiff's August 27 email to Tully.  Because there were adequate independent grounds for dismissal of counts I and II, the court declined to consider whether the Citizen Participation Act barred plaintiff's suit.

¶ 28    As for count III, the court reasoned that, since the reported statement was not defamatory when it was published by Farley and the League, it was perforce not defamatory when it was republished by Hosé.

¶ 29    As for counts VI and VII, the court found that the reported statement was not protected speech because plaintiff "was expressing his views as a member of [the Board]."  The court also found that the counts were barred by common law and statutory immunities for government officials.

¶ 30    Finally, the court dismissed counts IV (declaratory judgment) and V (injunctive relief) because the court had "already ruled on" the counts, leading to the prior appeal.

¶ 31    That same day, April 4, 2018, the trial court entered a written order dismissing the entire complaint with prejudice.

¶ 32    Subsequently, on May 4, 2018, plaintiff moved to vacate the dismissal and for leave to file a second amended complaint.  In the proposed complaint, plaintiff repleaded his defamation claims and free-speech claims and also added due process claims.  The trial court denied both motions, and plaintiff appealed.

¶ 33                                    II. ANALYSIS

¶ 34                          A. Governing Procedural Law

¶ 35    Defendants filed motions to dismiss under both sections 2-615 and 2-619 of the Code.  A section 2-615 motion to dismiss tests the legal sufficiency of a complaint.  *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009).  On review, the question is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted.  *Id.*  All facts apparent from the face of the pleadings, including the exhibits attached thereto, must be considered.  *Id.*  By contrast, a section 2-619 motion admits the legal sufficiency of the plaintiff's claims but raises defects, defenses, or other affirmative matter, appearing on the face of the complaint or established by external submissions, that defeats the action.  *Garlick v. Bloomingdale Township*, 2018 IL App (2d) 171013, ¶ 24.  Our review of a dismissal under either section is *de novo*.  *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 29.

¶ 36                          B. Defamation Counts

¶ 37    Counts I, II, and III are all premised on the reported statement, the portion of the Report in which Farley states that plaintiff "express[ed] his personal views on how we should *** reject any *** people different from white straight people."  The trial court dismissed counts I (Farley) and II (the League) on grounds that (1) the reported statement was not defamatory *per se*, (2) plaintiff failed to properly allege that Farley and the League acted with actual malice in publishing the statement, and (3) one of defendants' affirmative defenses, the fair-report privilege, applied to bar the claims.  The court dismissed count III (Hosé) because, since the reported statement was not defamatory when it was published, it was necessarily not defamatory when Hosé *re*published the statement.

¶ 38    In order to state a defamation claim, a plaintiff must plead that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of the statement to a third party, and that the publication caused damages to the plaintiff. *Tirio*, 2019 IL App (2d) 181019, ¶ 28. Additionally, because plaintiff was a public official when Farley and the League published the allegedly defamatory statement, plaintiff was required to plead that Farley and the League acted with actual malice, *i.e.*, with knowledge that the statement was false or with reckless disregard for its truth or falsity. *Id.* ¶ 58.

¶ 39    We begin with Farley and the League's assertion that plaintiff has forfeited his argument that the trial court erred in finding that he did not properly allege that Farley and the League acted with actual malice in publishing the reported statement. Plaintiff raised this argument for the first time in his reply brief, after Farley and the League pointed out its absence from plaintiff's opening brief. Plaintiff's opening brief addressed the sufficiency of the actual-malice allegations against Hosé but not those against Farley and the League. Points raised for the first time in the reply brief are forfeited (Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)), but forfeiture is a limitation on the parties, not the court (*City of Highland Park v. Bryan*, 2019 IL App (2d) 180662, ¶ 19), and we choose to address the point because the trial court's misconception of the pleading requirements in defamation cases is readily seen. In *Colson v. Stieg*, 89 Ill. 2d 205, 215-16 (1982), the supreme court held that the plaintiff sufficiently alleged actual malice in stating that the defendant made the statement in question " 'knowing it to be false, without reasonable grounds for believing it to be true, maliciously, wilfully, intentionally and without reasonable justification or excuse.' " Courts have relied on *Colson* in holding that, while the bare assertion that the defendant acted with "actual malice" is inadequate, the plaintiff need allege nothing more specific than that the defendant acted with knowledge of the statement's falsity or in reckless disregard of whether the statement was

true or false. See *Tirio*, 2019 IL App (2d) 181019, ¶ 59; *Krueger v. Lewis*, 342 Ill. App. 3d 467, 472-73 (2003). Here, plaintiff alleged that Farley and the League published the reported statement "with reckless disregard for the truth and, therefore, with malice." Though perhaps such allegations are still "conclusions," as the trial court remarked, they were nonetheless adequate under *Colson* and subsequent cases.

¶ 40    We proceed to determine the far more substantial question whether the reported statement was actionable defamation. There is no dispute that, on August 23, 2017, the library trustees debated a proposed strategic plan for the library that would require staff training in "equity, diversity, and inclusion." Farley reported that plaintiff expressed an objection to inclusiveness training. According to Farley, plaintiff remarked that the library should not "recognize homosexual marriage" but should "protect the children from homosexuals and exposure to homosexual life style." He then "proceeded to continue to express his personal views on how we should view straight people vs. gays and reject inclusion and people different from white straight people." In his complaint, plaintiff specifically denied using a racial term or advocating for the rejection of any people. He impliedly admitted the remainder of the reported statement, *i.e.*, that he expressed his personal views on gay people and "reject[ed] *** inclusion."

¶ 41    We note that, in his opening brief, plaintiff raises, and dismisses, the possibility that Farley cannot be understood as purporting to state actual fact in the reported statement. The first amendment to the United States Constitution (U.S. Const., amend. I) bars recovery under state defamation laws for statements that cannot reasonably be construed as stating actual fact (*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)), such as loose, figurative, or hyperbolic language (*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 397-98 (2008)). Defendants have not argued in this proceeding, either below or on appeal, that any portion of the

Report should not be interpreted as reporting actual fact. Since we lack argument from defendants on the point, we decline to address it.

¶ 42    In broad terms, a statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him or her. *Van Horne v. Muller*, 185 Ill. 2d 299, 307 (1998). "Certain limited categories of defamatory statements are deemed actionable *per se* because they are so obviously and materially harmful to the plaintiff that injury to the plaintiff's reputation may be presumed." *Id.* "A plaintiff need not plead or prove actual damage to his or her reputation to recover for a statement that is actionable *per se*." *Id.*

¶ 43    Illinois law recognizes five categories of statements that are considered actionable *per se*:

   "(1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party, or impute lack of ability, in his or her trade, profession or business; and (5) those imputing adultery or fornication." *Id.*

If the statement at issue does not fall into one of these categories, the action is for defamation *per quod* and damage to the plaintiff's reputation is not presumed. *Id.* Instead, the plaintiff must plead and prove special damages, *i.e.*, actual pecuniary loss, in order to recover. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87-88 (1996). The preliminary construction of an allegedly defamatory statement is a question of law; therefore, our review is *de novo*. *Green*, 234 Ill. 2d at 492.

¶ 44    Plaintiff claims that the reported statement was defamatory *per se* under categories (3) and (4) because it cast him as bigoted and biased, thus diminishing his standing in two "positions of

trust within the community": first, his public office as library trustee and, second, his vocation as attorney. We decline to consider the reported statement in relation to plaintiff's position as library trustee, because his complaint alleges prejudice only to his livelihood as attorney. See *Lindblad v. Nelson*, 2019 IL App (1st) 181205, ¶ 24 (the complaint fixes the issues in controversy and the theories upon which recovery may be based).

¶ 45 We consider, then, whether the reported statement defamed plaintiff in his occupation as attorney. We hold that it did not.

¶ 46 The Seventh Circuit Court of Appeals' decision in *Cody v. Harris*, 409 F.3d 853 (7th Cir. 2005) is helpful in understanding and applying categories (3) and (4). In *Cody*, the plaintiff, Mark Cody, was fired from his position as sales manager of a radio station. After his termination, obscene material began to appear on a website with a domain name that reflected the station's call letters, which Cody, while still employed, had been attempting to purchase for the station. Taft Harris, the station's manager, made statements to station staff and to an industry periodical that he suspected Cody was responsible for posting the material. Cody sued, claiming that the statements were defamatory *per se* under categories (3) and (4). The trial court dismissed the complaint, and the appellate court affirmed. The appellate court noted that

> "[s]tatements that have been deemed defamatory *per se* by Illinois courts under the third and/or fourth categories have always been related to job performance; to succeed, the plaintiff must have been accused of lacking *ability in his trade* or doing something bad *in the course of carrying out his job*." (Emphases in original.) *Id.* at 857.

"Conversely, attacks related to personal integrity and character have not been deemed defamatory *per se*." *Id.* at 858; see also *Madison v. Frazier*, 539 F.3d 646, 656 (7th Cir. 2008) ("[S]tatements

- 17 -

deemed to be defamatory *per se* in Illinois under [categories (3) and (4)] have been related to job performance, as opposed to attacks related to personal integrity and character.").

¶ 47    To illustrate that attacks on personal integrity and character do not fall within categories (3) and (4), *Cody* cited two cases, *Heying v. Simonaitis*, 126 Ill. App. 3d 157 (1984), and *Sangston v. Ridge Country Club*, No. 92 C 1981, 1992 WL 317138 (N.D. Ill. Oct. 29, 1992).  In *Heying*, the court held that statements accusing the plaintiff, a nurse, of personality conflicts with hospital colleagues, which involved the plaintiff's "name-calling" and use of "epithets," were not defamatory *per se* under categories (3) and (4).  *Heying*, 126 Ill. App. 3d at 164-65.  The court found that the statements did not "impute want of integrity or capacity to plaintiff in her profession" as nurse.  *Id.* at 165.

¶ 48    The plaintiff in *Sangston* was fired from his position as general manager of a country club. Afterwards, the country club reported that the reason for the termination was the plaintiff's unauthorized calls to "900" numbers from the club's premises.  *Sangston*, 1992 WL 317138, at *2. The court held that the report was not defamatory *per se* under categories (3) and (4):

> "The fact that Sangston made unauthorized phone calls while at work might have caused his dismissal from Ridge, but it does not insinuate that he is unable to capably perform managerial duties.  The reasons given for Sangston's dismissal only highlight one specific incident of misconduct.  They do not indicate general incompetence.

> However, even if we were to find that [the] statements did prejudice Sangston in his work, we do not feel that charging Sangston with making unauthorized calls to '900' phone numbers is so obviously hurtful to Sangston's reputation that it rises to the level of libel *per se*."  *Id.* at *4.

¶ 49 Based on *Heying* and *Sangston*, the *Cody* court held that Harris's accusation that Cody posted the obscene material was related to Cody's personal integrity, not his performance at the radio station:

> "Harris essentially implied that Cody has a bad temper, is unable to control his anger, and lacks the integrity and judgment to resist getting revenge in an immature and vicious manner. All of these implications go to Cody's personal, rather than professional, traits. The alleged misconduct did not even occur while Cody was on the job ***; Harris accused Cody of retaliating against the station not while he was an employee, but after (and apparently because of) his termination. This situation is not like the Illinois cases that have found defamation *per se* when a plaintiff's work or conduct while carrying out his employment duties has been impugned." *Cody*, 409 F.3d at 858.

¶ 50 The court went on to observe that, "[i]n some cases, personal integrity is so intertwined with job skills, that an attack upon it could constitute defamation *per se*." *Id.* To illustrate, the court cited *Kumaran v. Brotman*, 247 Ill. App. 3d 216, 225 (1993), where a substitute high school teacher claimed that a newspaper article was defamatory *per se* for accusing him of " 'working a scam' " by making it his full-time job to file numerous lawsuits against various defendants in order to extract monetary settlements. The appellate court, citing the dictionary definition of "scam" as a swindle or fraudulent scheme, held that the article was defamatory *per se* in two respects. First, the article could be read to impute the commission of a crime, namely deceptive practice. *Id.* 226-27 (citing 720 ILCS 5/17-1(B)(a) (West 1992)). Second, the article "could be found to have prejudiced [the plaintiff] in his profession or trade as a schoolteacher" and thus to constitute defamation under categories (3) and (4). *Id.* at 226. The court explained:

"The portrayal of [the plaintiff's] full-time occupation as the filing of numerous 'scam' lawsuits could tend to prejudice him in his trade as a teacher because a teacher would be expected to set a good example and function as a role model for his young, impressionable students. By portraying plaintiff as a swindler, the article could be found to prejudice his teaching ability and integrity because it presented him as someone who would not be an acceptable role model for young students." *Id.* at 227.

¶ 51    The *Cody* court found *Kumaran* distinguishable:

"We see no reason to believe that managing the sales department of a radio station requires a degree of integrity above and beyond that required for any job. It is true that Harris's accusations suggest that Cody lacks certain qualities desirable in an employee, and the accusations might indeed make it harder for Cody to get a job. But the increased difficulty in finding employment would be due to Cody's perceived bad character traits, not because of his perceived inability to do the job." *Cody*, 409 F.3d at 858.

¶ 52    In addition to *Kumaran*, plaintiff cites other Illinois cases where integrity was found to be essential to job duties. Plaintiff notes *Dobias v. Oak Park & River Forest High School District 200*, 2016 IL App (1st) 152205. In that case, Danielle Dobias, a high school teacher and coach, sued her supervisor, Thomas Tarrant, claiming that he made statements about her that were defamatory *per se*. For instance, Tarrant claimed that Dobias " '[w]as rolling around on a bed in a hotel alone with an athlete as witnessed by another coach who walked in.' " *Id.* ¶ 39. The court agreed with Dobias that "a teacher is expected to set a good example and to function as a role model for young, impressionable students." *Id.* ¶ 67. The court construed Tarrant's statement as describing "contact between a teacher and student-athlete that is far more intimate than would be appropriate." *Id.* ¶ 69. The court held that the remark was defamatory *per se* under categories

(3) and (4) because it "clearly imputed a lack of integrity in [the plaintiff's] profession and prejudiced her in that profession." *Id.* ¶ 72.

¶ 53 The court reached a different conclusion regarding Tarrant's statements that Dobias was verbally and physically aggressive toward him and that, on one occasion, while they were arguing on school grounds, Dobias grabbed Tarrant's arm and tried to force him into a room. The court held that the statements, though not "flattering," were "not so harmful that they would lower plaintiff's reputation in the eyes of the community and deter the community from associating with her." *Id.* ¶¶ 99, 101.

¶ 54 Plaintiff also cites *Cobbs v. Chicago Defender*, 308 Ill. App. 55, 57-58 (1941), where a clergyman sued a newspaper publisher over a newspaper article referencing rumors that the plaintiff was involved in " 'an unsavory incident of serious proportions.' " The court agreed with the plaintiff that the article was libelous *per se*, as "a clergyman in the practice of his profession must maintain a spotless reputation[.]" *Id.* at 58.

¶ 55 Defendants, for their part, bring our attention to *Kapotas v. Better Government Ass'n*, 2015 IL App (1st) 140534; *Basile v. Prometheus Global Media*, 225 F. Supp. 3d 737 (N.D. Ill. 2016); and *Cunningham v. UTI Integrated Logistics, Inc.*, No. 09-1019-GPM, 2010 WL 1558718 (S.D. Ill. Apr. 19, 2010), which are also pertinent to the scope of categories (3) and (4). *Kapotas* relied on *Vicars-Duncan v. Tactikos*, 2014 IL App (4th) 131064.

¶ 56 We begin with *Vicars-Duncan*, where the defendant wrote to the editor of a newspaper a letter describing his son's experience in being prosecuted for a traffic violation. The defendant stated that his son was told by the prosecutor on the case " 'that there were witnesses present who simply were not' " and that his son was " 'fighting a case he simply could not win.' " *Id.* ¶ 5. The prosecutor made the statements, according to the defendant, " 'in an attempt to get [his] son to

plead guilty to a charge which was ultimately dismissed.' " *Id.* The defendant further wrote that he complained to the prosecutor about " 'what [he] perceived to be the bullying of an 18-year-old by the prosecutor,' " but that the prosecutor's response did not " 'address[ ] the issue of her telling [the defendant's] son an untruth.' " *Id.*

¶ 57 The appellate court held that the statements in the letter were not defamatory *per se* under categories (3) and (4). The defendant's accusations of bullying and untruthfulness were "vague," and in any event the defendant did not accuse the prosecutor of *knowingly* telling a falsehood, which would have been a breach of professional ethics. *Id.* ¶ 33-34 (citing Ill. R. Prof'l Conduct (2010) R. 4.1 (eff. Jan. 1, 2010) ("a lawyer shall not knowingly *** make a false statement of material fact or law to a third person")). Moreover, the defendant wrote only that he " 'perceived' " bullying, which was "clearly a nonactionable statement of opinion." *Id.* ¶ 33 (citing *Moriarty v. Greene*, 315 Ill. App. 3d 225, 233 (2000) ("Only statements capable of being proven true or false are actionable; opinions are not.")). "[T]aken in whole," the defendant's letter accused the prosecutor "of not being fair to [the defendant's] son during an adversarial process," but "[a]ccusing someone of unfairness expresses nonactionable opinion." *Id.* Thus, the letter "[did] not obviously accuse plaintiff of lacking integrity in performing her job as an assistant State's Attorney or engaging in prosecutorial misconduct." *Id.*

¶ 58 In *Kapotas*, the plaintiff was employed as a surgeon at a public hospital. Following his resignation from that position, one of the defendants published newspaper articles claiming that the plaintiff was paid over $100,000 for unused sick time while on a leave of absence from the hospital. The articles acknowledged the hospital's position that it did not pay its employees for unused sick time and that the payments to the plaintiff were due to a clerical error. The plaintiff sued, claiming that the articles were defamatory *per se* because they "accused him of theft and

embezzlement, of lacking integrity in his employment duties, and imputed a lack of ability or otherwise harmed him in the medical profession." *Kapotas*, 2015 IL App (1st) 140534, ¶ 51. Affirming the dismissal of the complaint, the appellate court first determined that the articles did not impute the commission of any crime. *Id.* ¶¶ 51-54. Next, relying on *Vicars-Duncan*, the court noted that the conduct of which the plaintiff was accused in the articles did not implicate medical ethics or suggest that he lacked the ability to perform his job. *Id.* ¶ 56.

¶ 59 In *Basile*, the defendant published an article relating to a November 2014 cyber-attack on Sony Pictures, a movie studio. The headline of the article stated that security for Sony reported that the hack was an " 'inside job.' " *Basile*, 225 F. Supp. 3d at 740. The body of the article claimed that emails pointing to allegedly stolen files were sent from the plaintiff's email address. The article identified the plaintiff as a former production accountant at Sony. The plaintiff claimed that the article was defamatory *per se* under categories (3) and (4). The court disagreed, relying on *Cody*, *Kapotas*, and *Sangston*:

"In this case, Plaintiff was apparently a production accountant at Sony, and nothing in the article disparages her skills as a production accountant or accuses her of being unable to perform the specific duties of a production accountant. Nor does Plaintiff argue that maintaining the integrity of Sony's computer systems was part of her job responsibilities. Accordingly, the statements in the article do not fall within the third and fourth categories of defamation *per se*." *Id.* at 743.

¶ 60 The plaintiff in *Cunningham* sued his former employer for reporting that the plaintiff, during his employment in the defendant's warehouse, used profanity, made racially derogatory remarks, and physically intimidated coworkers and third parties. *Cunningham*, 2010 WL 1558718, at *4. The plaintiff claimed that the statements were defamatory *per se* under categories (3) and

(4) because they damaged his "business reputation." *Id.* The court disagreed, holding that the statements "related more to [the plaintiff's] personal character (by impugning that he was a bigot and a bully) than to his work or professional traits." *Id.* The court further determined that personal integrity was no more essential to the plaintiff's work as a warehouse employee than it was to the occupation of the plaintiff in *Cody* (sales manager of a radio station (see *Cody*, 409 F.3d at 858)). *Cunningham*, 2010 WL 1558718, *4.

¶ 61    The foregoing cases apply a corollary to the principle that a statement is defamatory *per se* only if it is "*obviously and materially* harmful to the plaintiff" (emphasis added) (*Van Horne*, 185 Ill. 2d at 307): a statement that is allegedly defamatory *per se* as an attack on professional integrity "must *obviously* impute a want of integrity in the performance of plaintiff's employment duties" (emphasis added) (*Vicars-Duncan*, 2014 IL App (4th) 131064, ¶ 33). The cases distinguish personal integrity from professional integrity. An attack on personal integrity, no matter how it might diminish reputation and damage future business or employment prospects, is not necessarily an attack on professional integrity. See *Cody*, 409 F.3d at 858; *Madison*, 539 F.3d at 656; *Basile*, 225 F. Supp. 3d at 743. Rather, "the defamation of professional integrity must be directly associated with job skills or functions." *Little v. JB Pritzker for Governor*, No. 18 C 6954, slip op. at 8 (N.D. Ill. Apr. 5, 2019). "Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession." Restatement (Second) of Torts § 573, cmt. e (1977); see *Cody*, 409 F.3d at 858 (revengeful posting of obscene content to website not pertinent to job duties as sales manager of radio station); *Basile*, 225 F. Supp. 3d at 743 (cyber-attack on movie studio did not bear upon competence as studio production accountant); *Cunningham*, 2010 WL 1558718, at *4 (physical intimidation, and use of profanity and racially

abusive language, did not reflect on function as warehouse employee); *Sangston*, 1992 WL 317138, at *4 (unauthorized phone calls to "900" numbers not pertinent to duties as manager of country club); *Heying*, 126 Ill. App. 3d at 164-65 (verbal abuse of colleagues not reflective of competence as nurse).

¶ 62    As *Cody* noted, Illinois courts identify good character more strongly with some occupations—*e.g.*, teacher and clergy—than with others.  See *Kumaran*, 247 Ill. App. 3d at 227 (teacher); *Cobbs*, 308 Ill. App. at 58 (clergy).  Other professions are not associated with such a high degree of personal character but are, nonetheless, regarded as positions of trust and so are governed by codes of ethics.  Examples are attorneys (*Vicars-Duncan*, 2014 IL App (4th) 131064, ¶ 33) and physicians (*Kapotas*, 2015 IL App (1st) 140534, ¶ 56).  In *Vicars-Duncan*, 2014 IL App (4th) 131064, ¶ 33, and *Kapotas*, 2015 IL App (1st) 140534, ¶ 56, the courts found it significant that the allegedly defamatory statements did not accuse the plaintiffs of conduct that would violate professional ethics.  See Restatement (Second) of Torts § 573, cmt. e (1977) ("[A] statement that a physician consorts with harlots is not actionable per se, although a charge that he makes improper advances to his patients is actionable; the one statement does not affect his reputation as a physician whereas the other does so affect it.").

¶ 63    Moving to the facts at hand, we note that an allegedly defamatory statement must be viewed in context.  See *Dobias*, 2016 IL App (1st) 152205, ¶ 6.  At the August 23 meeting, the Board discussed a proposal that library staff be trained in equity, diversity, and inclusion.  According to the official minutes of the meeting, plaintiff (1) stated that inclusion is part of a progressive political agenda; (2) objected to exposing child patrons of the library to materials promoting same-sex marriage, which he considered to be "lesser than heterosexual marriage"; and (3) advocated

for a "good" kind of inclusion rather than one that "would mean supporting all kinds [of practices], including 'terrorists' and 'cannibalism.' "

¶ 64 Plaintiff provided Tully his own summary of the meeting. Plaintiff reported that he recommended at the meeting that any staff training program reflect Illinois law, which dictates that public school children be taught to respect heterosexual marriage but is silent on same-sex marriage, even in light of its recent legalization. Plaintiff also reported voicing concern that uninhibited inclusion would lead, logically, to an embrace of what he saw as patently offensive practices.

¶ 65 According to Farley, after plaintiff suggested that library staff should "protect the children from homosexuals and exposure to homosexual life style," he "proceeded to continue to express his personal views on how we should view straight people vs. gays and reject inclusion and people different from white straight people."

¶ 66 Plaintiff denies that he mentioned race or advocated rejecting people. He construes the reported statement as an "accusation of bigotry" or "racism," which, he submits, prejudices his legal practice in that nonwhite, non-straight persons will be reluctant to retain his services as an attorney, out of suspicion that he is biased against them.

¶ 67 We disagree that the reported statement impugns plaintiff's character in a manner relevant to his profession as attorney. First, contrary to plaintiff's assertion, the statement attributed to him would not itself constitute a violation of professional ethics. Plaintiff claims that Rule 8.4 of the Illinois Rules of Professional Conduct of 2010 "forbids making racist or sexually insensitive remarks" and that the reported statement, therefore, had "a direct relation to his performance as a general practice attorney."

¶ 68     Plaintiff is incorrect.  Paragraph (d) of Rule 8.4 bars an attorney from "engag[ing] in conduct that is prejudicial to the administration of justice."  Ill. R. Prof'l Conduct (2010) R. 8.4(d) (eff. Jan. 1, 2010).  Plaintiff evidently has in view committee comment (3), which states: "A lawyer who, *in the course of representing a client*, knowingly manifests by words or conduct, bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, violates paragraph (d) when such actions are prejudicial to the administration of justice." (Emphasis added.)  Ill. R. Prof'l Conduct (2010) R. 8.4 cmt. 3 (eff. Jan. 1, 2010).  Plaintiff did not make the alleged remark in the course of representing a client.  Thus, we fail to see how Rule 8.4 applies.

¶ 69     Nor is it manifest from the reported statement that plaintiff lacks ability or integrity as an attorney.  Without doubt, a statement recommending the "reject[ion] [of] *** people different from white straight people" immediately strikes one as offensive.  We cannot, however, base our analysis on the visceral impact of the statement but must analyze it dispassionately under the proper criteria.  A statement is not defamatory simply because it paints the plaintiff as a bad character.  More particularly, an attack on *personal* integrity becomes an actionable attack on *professional* integrity only when the statement is directly related to job skills or function.  *Little*, slip op. at 8.  From all accounts of the August 23 meeting, plaintiff's preeminent concern was to insulate child patrons of the library from exposure to values and practices he considered personally offensive.  Admittedly, his personal rejection of those values was—so Farley reported—expressed in odious terms.  Even so, we do not perceive plaintiff as repudiating the rule of law, or implying that nonwhite, non-straight persons are not deserving of equal protection under the law, or suggesting an unwillingness to advocate as zealously for such persons as for others in a professional context.  There is no reason to believe that plaintiff cannot separate his personal views,

however offensive, from his performance as a professional. Plaintiff may well be correct that the reported statement will discourage some from retaining his services as an attorney, but such detriment is not the touchstone of whether a statement is defamatory *per se* under categories (3) and (4). In the cases discussed above, allegations of such conduct as racially derogatory language, physical aggression, cyberhacking, and revengeful posting of obscenity were found not to be defamatory *per se*, because they did not relate to the plaintiff's ability or integrity in his specific occupation. If, as a result of the reported statement, some are discouraged from retaining plaintiff for legal services, the cause will be more about what the reported statement revealed about his general character than about his capacity to be a fair and competent counselor. See *Cody*, 409 F.3d at 858 ("[T]he increased difficulty in finding employment would be due to [the plaintiff's] perceived bad character traits, not because of his perceived inability to do the job.").

¶ 70    Plaintiff cites *Schrottman v. Barnicle*, 437 N.E.2d 205 (Mass. 1982), which he claims "acknowledged the damaging nature of accusations of bigotry to a member of society in the early 1980s." The plaintiff in *Schrottman* sued for libel after a newspaper article was published attributing a racial slur to him. The Massachusetts supreme court upheld the trial court's finding that the article was defamatory, because the attribution of a racial slur "would discredit the plaintiff in the minds of a considerable and respectable segment in the community." (Internal quotation marks omitted.) *Id.* at 214.

¶ 71    *Schrottman* is inapposite because the court was applying broader criteria (general reputation in the community, untethered to occupational competence) than we must utilize in determining whether the reported statement was defamatory *per se* under categories (3) and (4).

¶ 72    A foreign court that applied defamation law that is essentially the same as Illinois's to facts similar to those here was the Supreme Court of Virginia in *Fleming v. Moore*, 275 S.E.2d 632 (Va.

1981).  In *Fleming*, the plaintiff, a university professor, publicly opposed a rezoning plan to permit the development, on property adjoining his own, of "high-density residential units for a predominantly black, lower-middle-income group of occupants." *Id.* at 634.  He claimed that the development would detract from the value of his property.  After the rezoning plan was voted down, the developer on the failed project published an advertisement accusing the plaintiff of " 'racism' " for " 'not want[ing] any black people within his sight.' " *Id.* at 634 n.3.  The plaintiff sued the developer for defamation.  Prior to the jury trial, the trial court determined as a matter of law that the advertisement was defamatory *per se* because it "prejudiced [the plaintiff] in his profession." *Id.* at 636. At the time, Virginia and Illinois recognized substantially the same categories of statements as defamatory *per se*. *Id.*[2]

¶ 73    The supreme court rejected the trial court's finding that the advertisement was defamatory *per se*.  The court explained that "[t]here must be a nexus between the content of the defamatory statement and the skills or character required to carry out the particular occupation of the plaintiff." *Id.*  The "nexus" was not established in that case because "the allegation of racism was not made

-------

[2] Virginia recognized the following categories of defamation *per se*: "(1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished. (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society. (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. (4) Those which prejudice such person in his or her profession or trade." *Fleming*, 275 S.E.2d at 635.

in the context of [the plaintiff's] employment as a teacher." *Id.* For instance, "[t]he advertisement did not allege *** that [the plaintiff] discriminated against the black students in his classes." *Id.* n.7. Thus, "while the allegation might have adversely affected [the plaintiff's] work, the statements did not necessarily affect him in his particular profession and consequently were not defamatory per se." *Id.* at 636.

¶ 74     Here, as in *Moore*, the required "nexus" was absent.  The statement that Farley attributed to plaintiff revealed at most personal bigotry, not lack of competence or integrity as an attorney.

¶ 75     Based on our analysis, we hold that the reported statement was, as a matter of law, not defamatory *per se*.  Consequently, Farley and the League were not liable for publishing the reported statement in the first instance, and Hosé was not liable for republishing the reported statement.  See *Dubinsky v. United Airlines Master Executive Council*, 303 Ill. App. 3d 317, 335 (1999) (republication of a nonactionable statement cannot give rise to liability); *Kakuris v. Klein*, 88 Ill. App. 3d 597, 605 (1980) (same).

¶ 76     Since we hold that the reported statement was not actionable defamation, and this basis is adequate to sustain the dismissal of counts I through III, we need not reach defendants' alternative grounds for affirmance, namely the fair-report privilege and legislative immunity.

¶ 77                              C. Free-Speech Counts

¶ 78     Plaintiff argues that the trial court erred in dismissing counts VI and VII, which alleged that the Council's removal of him from the Board for his remarks at the August 23 meeting violated his right of free speech under the Illinois Constitution (Ill. Const. 1970, art. I, § 4).  The trial court dismissed the counts in part because plaintiff's remarks at the meeting did not have free-speech protection, as he "was expressing his views as a member of [the Board]," not as a private citizen.

¶ 79 Plaintiff based counts VI and VII on the Illinois Constitution alone and not on the United States Constitution. Though "the Illinois Constitution may provide greater protection to free speech than does its federal counterpart" (*City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 446 (2006)), plaintiff is content to rely solely on case law interpreting the federal free-speech clause and does not ask that we find greater protection under the Illinois clause in this particular context.

¶ 80 In his opening brief, plaintiff relies principally on *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and *Bond v. Floyd*, 385 U.S. 116 (1966).

¶ 81 In *Pickering*, a school board dismissed a teacher after he penned a letter to the editor of a local newspaper in which he criticized the school board's funding decisions. In deciding whether the board's action violated the teacher's free-speech rights, the Court began by rejecting the notion that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." *Pickering*, 391 U.S. at 568. "At the same time," the Court noted, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* Thus, "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The Court held that the balance of those considerations in that case favored the teacher and that hence his dismissal was improper. *Id.* 574-75.

¶ 82    In his opening brief, plaintiff claims that his remarks at the August 23 meeting were protected under *Pickering* because he was speaking on a matter of public concern.   In their response brief, defendants point to *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which plaintiff neglected to mention in his opening brief.   In *Garcetti*, the Court clarified the test for determining the free-speech rights of public employees.   *Id.* at 418.   The Court observed that "*Pickering* and the cases decided in its wake identify *two inquiries* to guide interpretation of the constitutional protections accorded to public employee speech." (Emphasis added.)   *Id.*   The Court went on:

> "The first requires determining whether the employee spoke as a citizen on a matter of public concern.   [Citation.]   If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.   [Citation.]   If the answer is yes, then the possibility of a First Amendment claim arises.   The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.   [Citation.]   This consideration reflects the importance of the relationship between the speaker's expressions and employment.   A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."   *Id.*

¶ 83    In an abrupt reversal, plaintiff decides in his reply brief to disavow *Pickering* and deny that he was a "public employee" as that term is understood in *Pickering* and *Garcetti*.   Evidently, plaintiff realized the full import of *Pickering* (as clarified in *Garcetti*): if plaintiff was a "public employee" and spoke in that capacity, and not as a private citizen, at the August 23 meeting, then his speech was not protected.   Plaintiff now relies on *Jenevein v. Willing*, 493 F.3d 551, 557-58 (5th Cir. 2007), in which the court declined to apply the *Pickering/Garcetti* test to an elected state

judge because "his relationship with his employer differs from that of an ordinary state employee." Rather, the court applied the strict-scrutiny standard, which requires regulations on speech "to be narrowly tailored to address a compelling government interest." *Id.* at 558.

¶ 84 Plaintiff submits that his position as an appointed library trustee is more akin to the elected judge in *Jenevein* than to the teacher in *Pickering*. Plaintiff could have taken this position in his opening brief; instead, he cited *Pickering* as being factually analogous to this case. The new argument that plaintiff raises in his reply brief is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not raised in the opening brief are forfeited and shall not be raised in the reply brief).

¶ 85 We turn to plaintiff's citation to *Bond*, a case that predated *Pickering*. Following his election to the Georgia House of Representatives (House), Julian Bond issued a statement in opposition to the Vietnam War. Taking offense at the statement, the House voted to block Bond from taking the oath of office and assuming his seat in the House chamber. The Court held that the House's action violated Bond's right of free speech. In its analysis, the State conceded that it would have been a violation of Bond's free-speech rights for the State to punish Bond for making the statement while he was a private citizen. The State suggested, however, that it had an interest in regulating the speech of Bond as legislator if not Bond as private citizen—that "the policy of encouraging free debate about governmental operations only applies to the citizen-critic of his government." *Bond*, 385 U.S. at 136. The Court disagreed:

"The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. *** The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators. Legislators have an

obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them." *Id.* at 135-37.

¶ 86 Plaintiff contends that, as library trustee, he had the same free-speech rights as Bond, a state representative. Plaintiff does not consider how his situation, as a trustee appointed by a local municipal council, differed from Bond's, a representative elected in a statewide election. In fact, as defendants note, *Bond* generated substantial case law—none of which plaintiff acknowledges—on the very question whether appointed officials enjoy the same free-speech rights that *Bond* recognized for elected legislators. This case law recognizes

"the distinction between the First Amendment rights of elected officials, charged only with representing their own wishes and that of their constituency, and appointed officials who serve at the will of and on behalf of an appointing body and who are expected to represent and reflect the views of the appointing body." *McKinley v. Kaplan*, 262 F.3d 1146, 1151 (11th Cir. 2001) (county commissioners' appointee to county media board had no free-speech right against removal).

See also *Rash-Aldridge v. Ramirez*, 96 F.3d 117, 120 (5th Cir. 1996) (free-speech rights not implicated when city council removed fellow council member from her appointed position on the metropolitan planning board); compare *Pleva v. Norquist*, 195 F.3d 905, 916-17 (7th Cir. 1999) (mayor's at-will appointee to city zoning board had no free-speech right against removal), with *Zerla v. Stark County*, No. 1:19-cv-01140-JES-JEH, slip op. at 2-3 (C.D. Ill. July 26, 2019) (intimidation of county board member had free-speech implications; distinguishing *Pleva* because, although the board member was appointed, his position was subject to reelection and not

appointment). This is as far as we will wade into this seminal case law; we will certainly not generate an argument for plaintiff based on it. See *Bozek v. Erie Insurance Group*, 2015 IL App (2d) 150155, ¶ 37 (declining to address contention because the appellant cited case law without supporting analysis, and the issue was "too complex *** to address essentially *sua sponte*").

¶ 87    Since we hold that plaintiff has not established that his removal from the Board implicated his free-speech rights, we need not consider defendants' immunity claims as alternative grounds for affirmance.

¶ 88                                D. Due Process

¶ 89    Next, plaintiff argues that he sufficiently pled that his removal from the Board violated his due process rights. Plaintiff devotes most of his argument to demonstrating that his proposed second amended complaint alleged a due process violation. Below, we hold that the trial court did not err in denying plaintiff leave to file that complaint. *Infra ¶¶* 91-94.

¶ 90    Plaintiff also asserts that counts IV and V of his *first* amended complaint properly alleged a due process violation. Count V sought an injunction against plaintiff's removal from the Board. Count V incorporated the allegations of count IV, in which plaintiff asserted that section 2.53.1(d) of the Village code, which permits the Council to remove Village library trustees, exceeded the Village's home-rule powers. In the prior appeal in this case, we affirmed the trial court's declaratory judgment that section 2.53.1(d) was within the Village's home-rule power. See *Jaros*, 2017 IL App (2d) 170758, ¶ 50. Subsequently, in opposing defendants' motion to dismiss the first amended complaint, plaintiff suggested that the due process allegations in counts IV and V survived our ruling on appeal. The trial court disagreed, dismissing those counts with prejudice, along with the others.

¶ 91    We agree that counts IV and V did not plead a due process claim independent of the claim relating to home-rule authority.  The sole suggestion of a due process claim is the statement in count V that plaintiff's removal from office would cause "irreparable injury to his *** state-constitutionally protected liberty interest" in his position as library trustee.  However, there is no allegation as to how the removal *procedure* was lacking in due process.  There is at best an implication that a lack of home-rule authority would itself constitute a violation of due process.  As noted, we disposed of the home-rule issue in the prior appeal.  *Id.*  Consequently, we affirm the dismissal of counts IV and V.

¶ 92                          E. Second Amended Complaint

¶ 93    We last consider plaintiff's argument that the trial court erred in denying him leave to file his second amended complaint.  Plaintiff begins his argument by noting the trial court's remark that, though it was dismissing plaintiff's first amended complaint pursuant to sections 2-615 and 2-619, it would have permitted plaintiff to replead if the section 2-619 grounds posed by defendants were not sufficient of themselves for dismissal of the complaint.  Plaintiff's argument continues:

> "For the reasons set forth ***, the circuit court erred in granting the Section 2-619 motions
> to dismiss.
>
> Therefore, *based upon its own determination under Section 2-615*, the circuit court
> should have granted [plaintiff] leave to file his proffered Verified Second Amended
> Complaint.  This is also the result compelled by Illinois case law."  (Emphasis added.)

¶ 94    Plaintiff directs his challenge to the decision to deny him leave to file his second amended complaint.  He seems to suggest that, because the trial court, in dismissing plaintiff's first amended complaint, believed that he could remedy the section 2-615 deficiencies, the court bound itself to grant plaintiff's later motion for leave to file his second amended complaint.  This is a non sequitur.

In dismissing the first amended complaint, the court believed that plaintiff could establish no set of facts that would avoid the section 2-619 grounds submitted by defendants. This belief, if sound, would have supported a dismissal with prejudice, regardless of the court's position on the section 2-615 grounds. See *Lake Point Tower Condominium Ass'n v. Waller*, 2017 IL App (1st) 162072, ¶ 21 (dismissal under section 2-619 shall be made with prejudice if the plaintiff can establish no set of facts that will entitle him to relief). Therefore, we cannot see how the court somehow bound itself to grant the motion for leave to file the second amended complaint.

¶ 95 Nor has plaintiff convinced us that the result he desires is "compelled by Illinois case law." He cites three cases but provides neither pin cites nor parenthetical information. We presume he has in view the familiar principles, mentioned in these cases, that guide review of the dismissal of a complaint. However, since plaintiff does not even state these principles, much less apply them to the case at hand, his point is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points without supporting argument are forfeited). Consequently, we affirm the denial of plaintiff's motion for leave to file his second amended complaint.

¶ 96                                III. CONCLUSION

¶ 97 For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 98 Affirmed.

---

**No. 2-18-0654**

---

| | |
|---|---|
| **Cite as:** | *Jaros v. Village of Downers Grove*, 2020 IL App (2d) 180654 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 17-CH-1233; the Hon. Paul M. Fullerton, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Philip Nathanson, of The Nathanson Law Firm, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | John B. Murphey and Matthew D. Rose, of Rosenthal, Murphey, Coblentz & Donahue, of Chicago, and Enza I. Petrarca, of Downers Grove, for appellees Village of Downers Grove, Gregory W. Hosé, Robert T. Barnett, and Martin T. Tully. |
| | John J. Skawski and Justin J. Kaszuba, of Skawski Law Offices, LLC, of Oak Brook, for appellee Susan D. Farley. |
| | Denise A. Lazar and Christine E. Skoczylas, of Barnes & Thornburg LLP, of Chicago, and Matthew T. Ciulla (*pro hac vice*), of Barnes & Thornburg LLP, of Indianapolis, Indiana, for other appellees. |

---