# Illinois Official Reports

## Appellate Court

---

### *Jaros v. Illinois Court of Claims*, 2021 IL App (2d) 200397

---

| | |
|---|---|
| Appellate Court Caption | ARTHUR G. JAROS JR. and THE PEOPLE *ex rel.* ARTHUR G. JAROS JR., Petitioners-Appellants, v. THE ILLINOIS COURT OF CLAIMS, Respondent-Appellee. |
| District & No. | Second District<br>No. 2-20-0397 |
| Filed<br>Rehearing denied | July 23, 2021<br>August 25, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 19-MR-1362; the Hon. James D. Orel, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Arthur G. Jaros Jr., of Oak Brook, appellant *pro se*.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Paul Racette, Assistant Attorney General, of counsel), for appellee. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Justices McLaren and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1 Petitioner, Arthur G. Jaros Jr., appeals from the circuit court's refusal to grant him writs of *mandamus* and prohibition against the Illinois Court of Claims. Jaros sought the writs to compel the Court of Claims to reverse an adverse judgment against him. Because those writs were not available to Jaros to challenge the merits of the Court of Claims' judgment, the circuit court correctly dismissed this case, and we affirm.

¶ 2                                        I. BACKGROUND

¶ 3 We take the facts in the light most favorable to the plaintiff (*In re Estate of Shelton*, 2017 IL 121199, ¶ 35), although here the relevant facts are not in dispute. In addition, we have considered several items of correspondence that were attached as exhibits to Jaros's petition, as they provide some context for this case.

¶ 4 Jaros has been licensed to practice law since 1975. His primary area of focus has been trusts and estates. In 2002, Jaros and several members of his family established their own Christian-based charitable trust. At one point, the trust held some 60 acres of land in Woodboro, Wisconsin, and roughly $5 million in cash. The land, more than half of which was donated by Jaros personally, was intended for use as a Bible camp and to eventually be developed into a permanent structure named "The Eagle Cove Camp and Conference Center." A not-for-profit organization (Eagle Cove) was established to oversee the development, and Jaros held the positions of president, cotrustee, and attorney for Eagle Cove. The costs estimated to build the project were around $10 million.

¶ 5 In July 2013, the administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a complaint asking that Jaros be disciplined for misconduct. More specifically, in December 2013, the administrator filed an amended one-count complaint alleging that Jaros engaged in a conflict of interest and exerted undue influence over his longtime client, Jean Cooney.

¶ 6 According to the complaint, beginning in October 2006, Jaros drafted a third restatement to Jean's trust, which designated several large cash gifts to specific charitable endeavors upon Jean's death. One section of the restatement designated a death-time gift of $300,000 to Jaros's not-for-profit organization that eventually became Eagle Cove. In February 2007, Jaros drafted a fourth restatement, which increased Jean's gift to Eagle Cove to $425,000. Jaros drafted, and Jean executed, six more restatements and amendments to her trust, all of which preserved the gift. By the final version of the trust, Jean had allocated $470,000 to be split among nine nonprofit organizations; however, $425,000 of the bequest was directed solely to Eagle Cove. In January 2010, Jean resigned from her trust, and Jaros became the successor trustee. Jean passed in October 2010. At the time of Jean's death, her estate was valued at around $3.25 million. As trustee of Jean's estate, Jaros transferred the $425,000 to Eagle Cove.

¶ 7 Although in the amended complaint, the administrator made a number of allegations— including that Jaros never disclosed the potential conflict of interest to Jean, never obtained Jean's waiver, and never advised Jean to obtain independent legal advice regarding the gift— it appears that the administrator narrowed those allegations prior to the hearing. The only remaining claim was that Jaros's representation of Jean may have been materially limited by

his own interests as president, cotrustee, and attorney for Eagle Cove. *Cf.* Ill. R. Prof'l Conduct R. 1.7(b) (eff. Jan. 1, 1990); Ill. R. Prof'l Conduct (2010) R. 1.7(a)(2) (eff. Jan. 1, 2010).

¶ 8 A hearing was held before a three-member hearing board of the ARDC. See *In re Jaros*, No. 2013PR73 (Hearing Board Sept. 9, 2014). There, the administrator presented evidence that, in a 2006 zoning application for a conditional use permit for the camp and conference center, Jaros stated that the organization had solicited and secured significant cash donations for the project's financing and that one of his clients had "already executed an amendment to her estate planning providing for a $300,000 trust distribution to [Eagle Cove] upon her death." The application further stated that Jaros, using either his own funds or money from the Jaros trust to secure a mortgage, would personally cover any shortfalls in the financing of the first $3 million for the project.

¶ 9 Jaros testified that a significant number of his clients are Christians who are interested in supporting Christian ministries, including Eagle Cove. Jaros noted that Eagle Cove had received roughly $830,000 in cash donations since its inception. Jaros testified that Jean's trust's donation to Eagle Cove did not create "a legal expectancy" because he knew that she could revise her trust documents and eliminate the gift to Eagle Cove at any time. Jaros acknowledged that Jean's gift "potentially lessened" the amount he had to personally guarantee toward Eagle Cove's initial $3 million capital goal.

¶ 10 The hearing board heard evidence that Jaros had known the Cooney family and Jean for decades and began representing Jean and her husband in 2001. Jaros considered himself a family friend. Jaros advised Jean that she could reduce or eliminate her estate's tax obligations by making charitable distributions upon her death. Through the years, Jaros often spoke with Jean about the camp and what eventually became the Eagle Cove project. Jaros also showed Jean the plans for the conference center. Jean knew of Jaros's involvement in Eagle Cove. Jaros testified that he never solicited nor sought to influence her to make a donation. Rather, the decision to make a charitable bequest to Eagle Cove was Jean's idea because she thought it was a good cause. It was also Jean's idea to increase her donation from $300,000 to $425,000.

¶ 11 Jaros testified that he did not ask Jean about her donation while drafting the restatements and amendments to her trust. Jaros stated that he viewed himself merely as a " 'scrivener' " and felt that it was not his role to persuade or dissuade Jean from making any death-time charitable donation. Jaros did not feel that there was a conflict of interest because he believed that Jean's decision regarding which charities to leave her money to was a personal matter. As Jaros did not see a conflict of interest, he never sought a waiver from Jean. However, Jaros did have three of the amendments to Jean's trust notarized by other attorneys and staff with whom he shared office space and he had them consult with Jean outside of his presence.

¶ 12 In addition, two of Jean's family members testified that Jaros was Jean's longtime friend. Jean's family members testified that she was a " 'strong-willed' " and determined woman. They had a high opinion of Jaros and testified that he had been honest about the circumstances of Jean's donation to Eagle Cove.

¶ 13 Two members of the hearing board found that Jean's decision to leave money to Eagle Cove "was well-informed and based on [her] longtime friendship with [Jaros]." Accordingly, the majority found that Jean had consented by implication and effectively waived any conflict of interest. One member of the hearing board dissented. She noted that the rule against conflicts was rigid and that the facts presented a serious danger of divergent interests. Specifically, the dissent noted that Jaros had referenced Jean's expected bequest all the way back in Eagle

Cove's 2006 application for a conditional use permit and further noted that Jaros had committed his personal finances to that early part of the venture. Thus, the potential for divergent interests was more than theoretical: Every dollar Jean's estate spent on Eagle Cove was one less dollar that Jaros had to come up with. The dissent found that, while Jaros had displayed the "utmost integrity" before the hearing board, it was simply unreasonable for him to deny the existence of a conflict or that his representation of Jean may have been materially limited by his own interests. The dissent found clear and convincing evidence that Jaros had violated the rules and, after considering mitigation, suggested that Jaros be reprimanded.

¶ 14    The administrator did not file exceptions to the hearing board's report and terminated its prosecution of Jaros before the ARDC. Jaros, however, filed a motion before the ARDC demanding expenses of roughly $104,000. Specifically, Jaros asserted that the ARDC proceedings cost him some $54,000 in attorney fees for his defense and that he had lost nearly $50,000 in expected income due to the time he took defending himself. (Jaros included over 100 pages of invoices detailing his attorney fees, litigation expenses, and projected lost income.) Jaros then filed exceptions to the hearing board's report, seeking reimbursement and sanctions under Illinois Supreme Court Rule 137 (eff. July 1, 2013). The administrator denied Jaros's request for costs and the hearing board granted the administrator's motion to strike Jaros's fee petition.

¶ 15    Jaros then attempted to file original actions for *mandamus* in the Supreme Court and the Second District. Both petitions were denied. See *Jaros v. Jablonksi*, No. 118528 (Ill. Dec. 10, 2014); *Jaros v. Illinois Attorney Registration & Disciplinary Comm'n*, No. 2-14-1177 (Jan. 26, 2015) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Jaros then filed a complaint against the ARDC in the Court of Claims.

¶ 16    Jaros's complaint asserted that the ARDC was an "agency" covered by the Illinois Administrative Procedures Act (5 ILCS 100/1-1 *et seq.* (West 2016)). Section 1-20 of the Administrative Procedures Act defines "agency" as including "each officer, department, board, commission, agency, institution, authority, university, and body politic and corporate of the State." *Id.* § 1-20. If Jaros's assertion is correct that the ARDC is subject to the Administrative Procedures Act, then, under section 10-55(a) of the Administrative Procedures Act, he *might* be entitled to seek compensation pursuant to the statute's fee-shifting provision, which provides for attorney fees incurred in defense of "any allegation made by the agency without reasonable cause and found to be untrue." *Id.* § 10-55(a). Both the Administrative Procedures Act and the Court of Claims Act provide that jurisdiction for any dispute over an agency's failure to award litigation expenses lies with the Court of Claims. *Id.* § 10-55(b); 705 ILCS 505/8(i) (West 2016).

¶ 17    The Court of Claims, however, rejected Jaros's request and granted summary judgment in the administrator's favor. See *Jaros v. State*, 72 Ill. Ct. Cl. 135 (2019). The Court of Claims held that the ARDC was not an "agency" of the State that was covered by the fee-shifting provision of the Administrative Procedures Act. See *id.* The Court of Claims found instructive the decision in *Chicago Bar Ass'n v. Cronson*, 183 Ill. App. 3d 710 (1989), which held that the state auditor general lacked the authority to audit the ARDC's funds under the Illinois State Auditing Act (Ill. Rev. Stat. 1987, ch. 15, ¶ 301-1 *et seq.*). The Court of Claims noted that the Administrative Procedures Act had a similar statutory structure. Moreover, it continued, separation-of-powers principles militated that the ARDC, which was created by rule of the Illinois Supreme Court (see Ill. S. Ct. R. 751 (eff. Jan. 17, 2013)) and acts only as that court's

agent in administering discipline, was excluded from the Administrative Procedures Act's fee-shifting provision under an exception for " '[t]he justices and judges of the Supreme and Appellate Courts.' " *Jaros*, 72 Ill. Ct. Cl. at 137-38 (quoting 5 ILCS 100/1-20(3) (West 2016)). A unanimous four-justice opinion (see 705 ILCS 505/16 (West 2016)) denying Jaros's claim was issued on June 17, 2019 (*Jaros*, 72 Ill. Ct. Cl. at 137-38), and on November 12, 2019, four justices voted to deny his petition for rehearing (*id.* at 139-40).

¶ 18 That brings us at last to the case at hand. Before the circuit court, Jaros filed a "Petition for Orders of Mandamus and Prohibition." In it, Jaros sought a writ of *mandamus* to compel the Court of Claims to "expunge its June 17 2019 Opinion and November 12, 2019 Order to the extent they ruled that the ARDC is not an agency of the State of Illinois under the [Administrative Procedures Act] and dismissed the Case." Jaros further sought a writ of prohibition "forbidding" the Court of Claims "from permitting the June 17, 2019 Opinion and November 12, 2019 Order to remain of record and from making any determinations that the ARDC is not a 'commission of the State of Illinois' within the meaning of the [Administrative Procedures Act]."

¶ 19 The Court of Claims, represented by the Attorney General, filed a combined motion to dismiss Jaros's petition. See 735 ILCS 5/2-619.1 (West 2016). The Court of Claims asserted that Jaros had failed to state a claim for *mandamus* or prohibition to issue. See *id.* § 2-615. Furthermore, the Court of Claims asserted that Jaros was essentially seeking a review of the Court of Claims' decision on the merits, which is impermissible. See *id.* § 2-619(a)(9). Citing *Reichert v. Court of Claims*, 389 Ill. App. 3d 999 (2009), the court contended that Jaros could seek review in the circuit court only by filing a writ of *certiorari* on the basis of a due process violation. The Court of Claims noted that Jaros filed a complaint before the claims court, a response to the ARDC's motion for summary judgment, and a petition for rehearing, so he was given an opportunity to be heard before the claims court. Thus, because Jaros had not alleged that he was denied due process before the Court of Claims, his claim was barred in the circuit court.

¶ 20 After hearing argument, the circuit court granted the Court of Claims' motion to dismiss. Jaros has timely appealed.

¶ 21 II. ANALYSIS

¶ 22 On appeal, Jaros contends that the circuit court took an overly narrow approach regarding his petition for *mandamus* and prohibition and that relief should have been granted. As in the circuit court, Jaros would like us to proceed headlong into the nuances of his argument and ultimately reverse the Court of Claims' decision on the merits. We affirm.

¶ 23 As noted, the Court of Claims filed its motion pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2016)), which permits a defendant to seek dismissal based on both section 2-615 (*id.* § 2-615 (dismissal based on failure to state a claim)) and section 2-619 (*id.* § 2-619 (dismissal based on defects, defenses, or other affirmative matter)) of the Code. See, *e.g.*, *Jaros v. Village of Downers Grove*, 2020 IL App (2d) 180654, ¶ 16. When a petition is dismissed under either section, our review is *de novo*. *Id.* ¶ 35 (citing *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 29). In addition, we review *de novo* a circuit court's denial of writs of *mandamus* (*People ex rel. Glasgow v. Carlson*, 2016 IL 120544, ¶ 16) and prohibition (*Decatur Park District v. City of Decatur*, 2016 IL App (4th) 150699, ¶ 15).

- 5 -

¶ 24    The Court of Claims is not a "court" within the meaning of article VI of the Illinois Constitution of 1970; it is instead a fact-finding body of limited jurisdiction to hear claims against the State. *Rossetti Contracting Co. v. Court of Claims*, 109 Ill. 2d 72, 78-80 (1985). Accordingly, decisions of the Court of Claims are generally not subject to external judicial review. *Id.* at 79-80. A narrow exception exists that allows a party to file a writ of *certiorari* in the circuit court when the Court of Claims acts in such a manner that it deprives the party of due process rights. *Id.* at 78-79. "Requirements of due process are met by [a tribunal] conducting an orderly proceeding in which a party receives adequate notice and an opportunity to be heard." *Reichert v. Court of Claims*, 203 Ill. 2d 257, 261 (2003). A writ of *certiorari*, however, "may not be used to review the correctness of a decision by the Court of Claims based upon the merits of the case before it." *Id.*

¶ 25    As an initial matter, the Court of Claims asserts that our supreme court's holdings in *Reichert* and *Rosetti* regarding the availability of *certiorari* review for due-process claims militate that a party *cannot* file a petition for *mandamus* or prohibition against the Court of Claims. We acknowledge that there is at least some support for the Court of Claims' position. See *Hastings v. State*, 2015 IL App (5th) 130527, ¶¶ 24-25 (acknowledging *Reichert*'s discussion of "the scope of *certiorari* review [was] *obiter dictum*" but finding the discussion binding because "[t]he plaintiff has not cited and we have not found any supreme court authority that is contrary to *Reichert* concerning the proper scope of review for *certiorari* actions seeking review of a decision of the Court of Claims"); *Reichert*, 389 Ill. App. 3d at 1003 (finding "no contrary authority exists from the supreme court concerning the proper scope of review for *certiorari* actions seeking review of Court of Claims decisions" and "[t]hus, the *obiter dictum* from *Reichert* is binding"). However, the value of that position is necessarily tempered by the fact that, in *Reichert* and *Rosetti*, the supreme court was not asked to decide about the availability of any writ *other* than a writ of *certiorari* to review a final judgment of the Court of Claims. Although the Court of Claims does not address it, there is authority suggesting that a writ of *mandamus* would be proper to direct the Court of Claims to issue a final ruling in a case that had been pending for so long that the petitioner was arguably denied his right to due process. See *Dupree v. Patchett*, 361 Ill. App. 3d 789, 791 (2005) (finding circuit court had jurisdiction to order *mandamus* directing a judge of the Court of Claims to rule on petition that allegedly had been pending for 12 years).

¶ 26    But, here, the Court of Claims has issued a final decision. Jaros would like us to reverse it, but plainly we cannot. Even assuming that *mandamus* relief is available against the Court of Claims generally, *mandamus* "cannot be used to direct a public official or body to reach a particular decision or to exercise its discretion in a particular manner, even if the judgment or discretion has been erroneously exercised." *Hyde Park Medical Laboratory, Inc. v. Court of Claims*, 259 Ill. App. 3d 889, 894 (1994). In *Hyde Park* for example, the First District upheld the denial of a *mandamus* petition directing the Court of Claims to award postjudgment interest. *Id.* To issue the order would not merely direct the Court of Claims to " 'abide by [its] statutory duties' " but would plainly attempt to strong-arm the claims court to make a particular award in a particular way. See *id.*

¶ 27    Jaros's request for *mandamus* was no different than the one in *Hyde Park*. He would like us to compel the Court of Claims to view the ARDC as a state agency subject to the Administrative Procedures Act in his case before the claims court. Like the circuit court, we determine that we simply cannot grant *mandamus* relief under such circumstances.

¶ 28    It is also abundantly clear that a writ of prohibition cannot be issued in this case. " 'A writ of prohibition is an extraordinary judicial process whereby a superior court may prevent inferior tribunals or persons from exercising a jurisdiction with which they have not been vested by law.' " *Board of Governors of State Colleges & Universities for Chicago State University v. Illinois Fair Employment Practices Comm'n*, 78 Ill. 2d 143, 149-50 (1979) (quoting *People ex rel. Town Court of Cicero v. Harrington*, 21 Ill. 2d 224, 226 (1961)). The writ is used to "restrain" the lower court "from further action in the cause *** when damage and injustice are likely to result." *Maloney v. Bower*, 113 Ill. 2d 473, 477 (1986). Here, Jaros is not asserting that the Court of Claims *lacks* jurisdiction over him such that it must be "prohibited" from continuing to hear his case. See, *e.g.*, *id.* The Court of Claims has already heard Jaros's case and adjudicated its merits, and it was the only court that could have.

¶ 29    Jaros's creative procedural maneuvers notwithstanding, we simply have no power to grant him any relief. While it is understandable why he disagrees with the Court of Claims' decision, we cannot review the correctness of its decision in his case. *Certiorari* is the only mechanism that allows us to even consider a final judgment of the Court of Claims, but, even then, our review is only for due-process violations; "*certiorari* may not be used to review the correctness of a decision by the Court of Claims based *upon the merits of the case before it*." (Emphasis added.) *Reichert*, 203 Ill. 2d at 261.

¶ 30    So, even if we agreed with Jaros that the Court of Claims misapplied the Administrative Procedures Act in his case, it would be of no moment. A party would not be deprived of due process merely because the Court of Claims misapplied the law or otherwise committed an error in its reasoning. "Due process does not guarantee against erroneous or unjust decisions by courts which have jurisdiction of the parties and the subject matter [citation] and a constitutional question is not presented where a court may have misconstrued the law or committed an error for which its judgment should be reversed." *Reyes v. Court of Claims*, 299 Ill. App. 3d 1097, 1105 (1998). Jaros's pleadings demonstrate that he was given notice and the opportunity to be heard before the Court of Claims. As the circuit court found, due process does not entitle him to anything further. See *Reichert*, 203 Ill. 2d at 261; see also *Krozel v. Court of Claims*, 2017 IL App (1st) 162068, ¶ 18; *Reyes*, 299 Ill. App. 3d at 1104-05 (1998); *Klopfer v. Court of Claims*, 286 Ill. App. 3d 499, 505-06 (1997).

¶ 31                                    III. CONCLUSION
¶ 32    For the reasons stated, we affirm the judgment of the Circuit Court of Du Page County dismissing Jaros's complaint.

¶ 33    Affirmed.